**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Greenbelt Division)

| | | |
|---|---|---|
| ALPHA PSI CHAPTER OF THETA CHI | : | |
| FRATERNITY, *et al.* | : | |
| Plaintiffs | : | |
| v. | : | Case No. _____ |
| | : | |
| JAMES BOND, *et al.* | : | |
| Defendants. | : | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

Plaintiffs filed this case to protect and remediate their rights under the First and Fourteenth Amendments of the U.S. Constitution. Defendants, the University of Maryland and its employees, are attempting to investigate and adjudicate unidentified disciplinary matters and curtail lawful speech and association pertaining to Plaintiffs in unconstitutional and unlawful manners. Specifically, Defendants' decision to unilaterally suspend the normal operations of all Chapters that are members of the Interfraternity Council (IFC) and Panhellenic Association (PHA) (IFC and PHA organizations, collectively, the "Social Fraternities"), including all of the Plaintiffs—without any suggestion of actual wrongdoing, coupled with the imposition of an ambiguous, vague, and overly broad notice that has indefinitely suspended every single Chapter's unrestricted ability to operate—runs afoul of basic notions of due process. Beyond that, even as modified, the directives that members of these chapters may not speak to one another about what the University is doing is clearly an infringement upon First Amendment freedoms of speech.

Plaintiffs move the Court under Rule 65, Fed. R. Civ. P., 42 U.S.C. § 1983, and 42 U.S.C. § 1988 for a temporary restraining order and preliminary injunction pending final disposition of

1

this lawsuit. The requested temporary restraining order and preliminary injunction shall enjoin the Defendant(s) and its officers, agents, servants, employees, and attorneys from enforcing the conditions of any interim disciplinary measures against Plaintiffs.

## II.    STATEMENT OF FACTS

As set forth in the Verified Complaint (ECF No. 1), the University of Maryland hosts several notable fraternities and sororities, each with a unique history and mission. Among them are the Chapter Plaintiffs. The Alpha Psi Chapter of Theta Chi Fraternity, established in 1929, has around sixty-seven members, and is dedicated to fostering success, camaraderie, and leadership. Theta Chi's values center on true friendship, mutual improvement, and assistance to others, as reflected in its motto and Creed. Similarly, the Beta Kappa Chapter of Kappa Alpha Order, established in 1914, promotes values like reverence, gentility, and excellence among its members, who are all current University of Maryland students. Another prominent fraternity chapter, the Epsilon Delta Chapter of Alpha Sigma Phi Fraternity, founded in 1997, prioritizes character development and brotherhood among its approximately sixty members. Meanwhile, the Epsilon Gamma Chapter of Alpha Tau Omega Fraternity, established in 1930, boasts around 115 members, and emphasizes preparing its members to be leaders in their communities, while also facilitating scholarship, character, service, friendship, brotherhood, and networking. John Does 1, 2, and 3 are current students at the University of Maryland. John Doe 1 is a member of the Beta Kappa Chapter of Kappa Alpha Order, John Doe 2 is a member of the Epsilon Delta Chapter of Alpha Sigma Phi Fraternity, and John Doe 3 is a member of the Alpha Psi Chapter of Theta Chi Fraternity.

Defendant James Bond, the Director of Student Conduct at the University of Maryland, along with Defendant James McShay, the Assistant Vice President of Student Affairs and Interim Director of Fraternity and Sorority Life—both of whom report to Defendant Patricia Perillo, Vice

2

President for Student Affairs—have each endorsed the First and Second Suspension and No Contact Orders discussed herein. The actions of these officials are deemed state action due to their official roles within the University of Maryland, a public institution of the State, as do the actions of the University's President, Defendant Darryll Pines, as he is the individual ultimately responsible for overseeing the University's compliance with federal and state laws.

Defendants enact numerous regulations regarding student conduct and discipline pursuant to the power and authority conferred by the laws of the state of Maryland. Appropriately, the University pledges in its Code of Student Conduct that:

> The Office of Student Conduct provides a fair and balanced University process for resolving allegations of Student Prohibited Conduct. Students will be treated fairly and with dignity and respect without regard to [any] legally protected status…. The focus of the Student Conduct Review Process is to resolve allegations of Student Prohibited Conduct. **Students have the right to be notified of the allegations and specific policies they are alleged to have violated, to have access to the information underlying the allegation(s), and to have an opportunity to respond**.

(Emphasis added.) (ECF No 1, ¶ 27.)

Additionally, the University's Office of General Counsel recognizes that:

> Public universities, like UMD, are subject to the constitutional restrictions set forth in the First Amendment **and thus may not take action which infringes an individual's freedom of speech under the Constitution**…. The term "speech" constitutes expression that encompasses for more than just words.

(Emphasis added.) (*Id.* at ¶ 25.)

More specifically, within the context of student organizations, Defendants recognize,

> Just like students themselves, student organizations at UMD have assembly and speech rights. UMD cannot deny to a group of students recognition as a student organization, so long as they meet established requirements to obtain such recognition…. **Likewise, student organizations can engage in expressive activities on campus consistent with UMD's time, place and manner restrictions for doing so. To do otherwise would be tantamount**

**to viewpoint discrimination and contrary to our obligations under the Constitution and law**.

(Emphasis added.) (*Id.* at ¶ 26.)

With respect to the University's disciplinary process, Defendants' publications clarify that, in certain circumstances, interim measures may be taken to protect the campus community. Specifically, the Code of Student Conduct states that, "based on the nature and circumstances of the Referral, the Director of Student Conduct… may authorize Interim Measures to ensure the safety and well-being of the parties and others in the University community, as appropriate including but not limited to" either interim suspension or a cease and desist directive. However, for either interim measure to be imposed, there must be some sort of "Referral"—or conduct complaint—submitted, as well as some actual "evidence that the continued presence" and operation of the student organization poses a significant or substantial threat to the health and safety of others. (*Id.* at ¶ 28.)

Despite the university's professed commitment to First Amendment protections, on March 1, 2024, Defendants McShay and Bond distributed the March 1, 2024, Suspension and No Contact Order (referred to as the "Original Order") to the Plaintiffs. This order selectively targets only the thousands of members of the Social Fraternities while ignoring other student organizations. (*Id.* at ¶¶ 29–30.)

The Original Order suspended all new member program activities, imposed a social moratorium on the mentioned organizations, and mandated a complete cessation of contact between current and new members. (*Id.* at ¶ 31.) It explicitly warned of disciplinary consequences for non-compliance, representing an undue restriction on speech and associational rights. Additionally, the order was issued without evidence indicating any substantial threat(s), as required by the Code of Student Conduct.

4

Subsequently, on March 6, 2024, Defendants McShay and Bond issued another Suspension and No Contact Order to the Plaintiffs. The Amended Order, which remains in effect at the time of filing this Motion and is set to continue indefinitely, also targets only the Social Fraternities while excluding other student organizations. (*Id.* at ¶¶ 37–38.) Though it allows for discussions on *certain* topics, the Amended Order still imposes content-based restrictions on some speech and maintains the prohibition of all new member activities and social events involving alcohol. Despite its modifications from the Original Order, the directive continues to raise grave concerns about prior restraint on speech and associational rights. Indeed, Defendants are imposing restrictions on speech, association, and due process rights on all thirty-six (36) Social Fraternity groups, regardless of whether such groups are even suspected of misconduct, to engage in a sweeping inquisition.

The University's rationale for these restrictions, as stated in the Amended Order, is to facilitate an investigation into alleged health and safety infractions and to maintain credibility during the University's inquisition. (*Id.* at ¶ 44.) However, the issuance of the Amended Order lacks predeprivation due process (or postdepreviation remedies) for the Plaintiffs. (*Id.* at ¶ 47.) This raises serious questions about the University's commitment to its professed respect for freedom of speech and its adherence to due process principles.

Representatives of the Chapters have sought information and the ability to review any documentation that would justify the Amended Order's restrictions, but Defendants have refused to provide Plaintiffs with access to any evidence, even if only to see without copying such evidence, that relates to the issuance of the Amended Order.

As of the date of the filing of the Verified Complaint and this Motion, Plaintiffs have been restricted from even talking to each other for almost two (2) weeks, during which time Plaintiffs

have been unable to freely enjoy their constitutional rights, despite the University not providing to the Plaintiffs either adequate notice or an opportunity to be heard.

Plaintiffs intend to continue operating at the University while also engaging in constitutionally protected speech and expression, but they face real and immediate threats that Defendants will continue to subject them to unwarranted restrictions devoid of procedural due process protections and will impose further sanctions against them in the event Plaintiffs engage in such speech or expressive activities. (*Id.* at ¶ 50.)

I.    LAW AND ARGUMENT

A.  Standard for Granting Temporary and Preliminary Injunctive Relief

Plaintiffs request the Court enjoin Defendants from preventing Plaintiffs from resuming full, unrestricted fraternal operations, including social events and activities, along with unfettered communication with new members. Injunctive relief is appropriate because Plaintiffs will suffer irreparable harm for which there is no adequate remedy at law if Plaintiffs continue to be wrongfully deprived of their constitutional rights, and Defendants will not be harmed by the injunction.

Although a preliminary injunction is considered an extraordinary measure, it should be issued when necessary to preserve the status quo pending the final outcome of a case. *Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981). In proceedings challenging a university's determination on student conduct matters, status quo has been "interpreted to refer to the last uncontested set of facts preceding the pending controversy." *Garshman v. Penn. St. Univ.*, 395 F.Supp. 912, 920 (M.D. Penn. 1975).

To that end, the Fourth Circuit has established the standards for obtaining a preliminary injunction. Specifically, to obtain such relief, a party must show: (1) it is reasonably likely to

succeed on the merits; (2) it is suffering irreparable harm that outweighs any harm the nonmoving party will suffer if the injunction is granted; (3) there is no adequate remedy at law; and (4) and an injunction would not harm the public interest. *See Sohmer v. Kinnard,* 535 F. Supp. 50 (D. Md. 1982).

If the plaintiff meets these threshold requirements, a court should then weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it. *Id.* The balancing involves a sliding scale analysis, and the greater the movant's chance of success on the merits, the less strong a showing must it make that the balance of harms is in its favor. *See Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802 (4th Cir. 1991).

The requirements for a temporary restraining order—the issuance of which is authorized by Rule 65 of the Federal Rules of Civil Procedure—are the same as for a preliminary injunction. *Assoc. of Comm. Cancer Ctrs. V. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020).

Plaintiffs' case satisfies all the requirements for a temporary restraining order and preliminary injunction, and the balance of factors weighs heavily in favor of granting such requested relief. Further, the temporary and preliminary injunction Plaintiffs seek here would preserve the status quo of the Chapters remaining registered student organizations capable of engaging in unrestricted activities and events pending the resolution of this litigation. There are critical upcoming events and activities scheduled that directly impact Plaintiffs, before which this matter is unlikely to be resolved, such as formal initiation events (which necessarily entails "social events or activities") and scheduled philanthropic events.

**B. Plaintiffs are Likely to Succeed on their Constitutional Claim.**

Plaintiffs are entitled to injunctive relief because Plaintiffs are likely to succeed on the merits of their claims. A movant seeking injunctive relief does not need to demonstrate a likelihood of absolute success on the merits. Rather, the party "must only show that [its] chances to succeed on [the] claims are '*better than negligible*.'" (Emphasis added.) *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018). Plaintiffs satisfy their burden on this element with respect to their constitutional violation claims concerning both the First and Fourteenth Amendments, as apparent from Defendants' own statements, including the March 6, 2023, Amended Order.

In Maryland, indeed in every state, the relationship between a state university and its students is also governed by the U.S. Constitution. *Healy v. James*, 408 U.S. 169, 180 (1972) ("State colleges and universities are not enclaves immune from the sweep of the First Amendment."). Undoubtedly, Plaintiffs' speech and associational rights are an "inseparable aspect of the 'liberty' assured by the Due Process Clause" of the Fourteenth Amendment. *Tashjian v. Republican Party of CT.*, 479 U.S. 208, 214 (1986). And as the U.S. Supreme Court acknowledged in *Tinker v. Des Moines Indep. Comm. Sch.*, students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 93 U.S. 503, 506 (1969).

      i.    <u>Plaintiffs' expressive associational rights are constitutionally protected liberty interests.</u>

To come within the ambit of the First Amendment's protection of expressive association, "a group must engage in some form of expression, which it be public or private." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 650 (2000). This is a minimal standard, as any association seeking to transmit a system of values engages in expressive activity. *Id.*

A fraternal organization's right to expressive associational rights is well established. *See, e.g., Iota Xi Chapter of the Sigma Chi Fraternity v. Patterson*, 538 F.Supp.2d 915, 923 (E.D. Va.

2008), aff'd on other grounds, 566 F.3d 138 (4th Cir. 2009) (holding that a college fraternity with an institutional mission of instilling leadership skills and community values in its members was protected by the First Amendment's expressive associational right); *Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of N.Y.*, 443 F.Supp.2d 374, 391–92 (E.D.N.Y. 2006), vacated on other grounds, 502 F.3d 136 (2d Cir. 2007) (predominately Jewish male fraternity whose members met with a Rabbi and engaged in community service, with main pursuit of "brotherhood," was an expressive association).

Here, Plaintiffs have adequately described their fraternal institutional missions, which include inculcating their members with certain leadership skills and community values. Consequently, Plaintiffs are protected by the First Amendment's expressive associational right, and thus, have protected liberty interests in the expressive associational rights of the Chapters' members.

For example, each of the Fraternity Chapters' purposes and values include many that have traditionally been the purposes and values of college social fraternities: brotherhood, character, scholarship, leadership, social/community service, campus participation, heritage, and culture, and personal growth. (ECF No. 1, ¶¶ 5-12.) These purposes and values are ingrained in each aspect of Plaintiffs' activities and operations, be it regular meetings, leadership structures, housing options, new member recruiting, selection, and programming, and sacred rituals. In fact, it is these Chapters' selective recruitment processes, unique meeting structures, and adherence to a specific set of principles and bylaws that distinguish these student organizations from one another, from other special interest organizations, and from the general student body.

It cannot be rationally disputed that, given the assertion of the expressive nature of Plaintiffs' activities and efforts to transmit such a system of values, the Chapters and their members engage in expressive association.

> ii.   Because the Amended Order imposes a content-based restriction on free speech and association, it is presumptively unconstitutional.

Given the Amended Order's facial attempt to regulate the content of expression and/or the identity of the speaker(s), it is presumptively unconstitutional. *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 163 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."); *see also Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1184 (6th Cir. 1995) (explaining that the ability to express oneself based upon the "identity or affiliation of the speaker" was held to be "impermissible viewpoint discrimination.").

Put simply, the Amended Order treats students and student organizations differently based solely upon the status of the speaker(s) and/or the subject matter of the speech. For example, the Amended Order confirms it only seeks to restrict communications "regarding Greek-letter organization-related activities," but does not ban communications between members of Maryland's marching band that may be engaging in hazing activities. Likewise, the Amended Order does not attempt to regulate the speech of any Maryland students aside from those belonging to a certain Greek-lettered social fraternity or sorority, thereby determining which speech is permitted based upon the identity of the speaker(s).

As such, any infringements by Defendants on Plaintiffs' rights to freedom of association, along with their free speech rights, must be subjected to the closest scrutiny, which requires both a compelling governmental interest that is achieved by the least restrictive means possible. *Sanitation & Recycling Indust. v. City of N.Y.*, 107 F.3d 985 (2d Cir. 1997); *see also Healy*, 408

U.S. at 181–84 (explaining that the denial or revocation of university recognition is a form of prior restraint, and therefore a "heavy burden" rests on the college to demonstrate the appropriateness of that action). This is particularly true in the educational context, where these constitutional protections are "nowhere more vital." *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972).

      ii.    <u>Defendants' content-based restrictions on Plaintiffs' First Amendment rights cannot survive strict scrutiny because they do not serve compelling interests, nor are they narrowly tailored.</u>

Given the existence of these recognized freedoms that are protected under the First Amendment and the content-based, direct infringements upon those rights that result from Defendants' imposition of the Amended Order, Defendants must be able to demonstrate that there is some compelling state interest being served through narrowly tailored means for a court to uphold their actions. *Natl. Pub. Radio, Inc. v. Klavans*, 560 F.Supp.3d 916, 926–27 (D. Md. 2021); *see also Boos v. Barry*, 485 U.S. 312 (1988). Defendants are unable to do so, as it is certainly not narrow. The Amended Order involves much more infringement than is necessary to meet any state interest Defendants may assert.

"With respect to narrow tailoring, [courts] require the government to prove that no 'less restrictive alternative' would serve its purpose." *Central Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016). "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). When "measures taken by the University plainly [go] beyond a narrowly-tailored attempt to further a legitimate interest… and result[] in a prohibition and chilling of protected speech," a violation of the First Amendment is easily found. *Crue v. Aiken*, 204 F. Supp. 2d 1130, 1142 (C.D. Ill. 2002).

The *Crue* case involved a challenge under the First Amendment to a university's preclearance directive banning all speech by students and faculty members directed toward

prospective student athletes. Although the school had a legitimate interest in complying with the National Collegiate Athletic Association's (NCAA) recruitment regulations when imposing the preclearance directive banning the speech, the court found the restriction improperly abridged constitutional rights. In declaring the directive to be in violation of the First Amendment, the court reasoned that the directive was a content-based restrain on speech that was not narrowly tailored to achieve the University's stated purpose, and that the school's goal of complying with the NCAA regulations did not outweigh the plaintiffs' free speech interests. *Id.*; *see also Mahanoy Area School Dist. v. B. L.,* 141 S.Ct. 2038, 2047 (2021) (holding that a school's interest in teaching good manners is not sufficient to overcome a student's interest in free expression).

The *Crue* court noted that any prior restraint on expression comes before a court with a heavy presumption against its constitutional validity. 204 F. Supp. 2d at 1140 (citing *CBS v. Davis,* 510 U.S. 1315 (1994)). This is particularly true when speech is banned *before* it happens. In such situations, there must be some "concrete basis to presume that such communications would actually result in [a] feared harm." *Id.* at 1142. These feared harms must be real, not merely conjectural, if the state singles out expressive activity for special regulation, and the regulations must, in fact, alleviate the harms in a direct and material way. *Id.* at 1145. And the U.S. Supreme Court confirmed that an educational institution must set forth evidence establishing a "substantial disruption" of a school activity or a threatened harm to the rights of others for the school's actions to be justified. *Mahanoy*, 141 S.Ct. at 2047 (citing *Tinker*, 393 U.S. at 514). Further, content-based restrictions that are unlimited in time and place are overbroad when they "unnecessarily reach a substantial amount of constitutionally protected conduct, seemingly without any regard for whether the proposed expression reasonably pose[s] a threat to the University's legitimate interests." *Crue*, 204 F. Supp. 2d at 1147.

Defendants attempt to justify their decision to enforce a complete ban on all communication (in all forms or mediums) between active and new members, coupled with the prohibition of social events involving alcohol, by asserting the following purpose for the directive:

> To implement a pause on new member activities while the University completes its investigation into widespread allegations of health and safety infractions in organizations' new member intake processes, and to help effectuate a prompt and effective investigation into such allegations. It is critical that the University preserve the credibility of student responses during the investigatory process.

(Ex. C to Complaint.)

In essence, the University doubts the abilities of only its students associated with certain social fraternities and sororities—but not any other category of students (or students in general)—to maintain their credibility during pending investigations if permitted to speak to one another about *anything* concerning their fraternal organizations. Setting aside the evident mistrust the University appears to have in its own students—whom it previously selected for admission—this objective is not compelling, and is certainly not being accomplished through the least restrictive means possible.

As with ensuring compliance with the NCAA's regulations, maintaining credibility during an investigation is not a compelling state interest that should be prioritized over respecting well-established constitutional rights. But even if it were a legitimate governmental interest, the restrictions imposed by Defendants are overbroad and unrelated to furthering that goal. For instance, prohibiting active members from participating in social events where alcohol is present does not logically contribute to ensuring honesty during interviews. How would attending a member's twenty-first birthday celebration at a bar affect interview integrity? Moreover, Defendants cannot possibly explain how allowing new and active members to communicate with each other about current matters such as housing contracts, ordering fraternity branded

13

merchandise, or participating in a chapter-wide philanthropy event during spring break would negatively impair interviewees' truthfulness during any (reasonable) interviews. Because the directive covers far more expression than could ever be justified, the restriction is facially overbroad and therefore unconstitutional.

Moreover, although the Defendants' restrictions may have been enacted in the context of an investigation into potential hazing to safeguard community health and safety, the origins of the infringement do not alter its scrutiny under judicial review: strict scrutiny remains applicable.

Critically, Defendants have repeatedly acknowledged that "no single or specific incident led to this decision. Our decision was made in an effort to help *prevent* a significant incident." (Emphasis in original.) *March 1: Pause on IFC, PHA New Member Activities*, UNIV. OF MD. DIV. OF STUDENT AFFAIRS, https://fsl.umd.edu/ifc-pha-new-member-activities (last visited Mar. 12, 2024).

It is well established that "mere undifferentiated fear or apprehension of illegal conduct is not enough to overcome First Amendment rights, and speculation that individuals might at some time engage in illegal activity is insufficient to justify regulation by the state." *Gay Students Org. of Univ. of N.H. v. Bonner*, 509 F.2d 652, 662 (1st Cir. 1974) (referencing *Tinker*, 393 U.S. 503); *see also Crue*, 204 F. Supp. 2d 1130; *Gay Activists Alliance v. Bd. of Regents of Univ. of Oklahoma*, 638 P.2d 1116 (Okla. 1981).

Here, Defendants have not identified a single instance by a single Plaintiff (or any other fraternal group at Maryland) in which actual illegal acts occurred or are even alleged to have occurred. Accordingly, Plaintiffs are wholly unaware of the existence of any formal complaints, and no evidence has been adduced to support the extreme ban Defendants have unilaterally imposed on Plaintiffs.  Defendants also have offered no showing to suggest Plaintiffs have any

intent to infringe reasonable campus rules, interrupt classes, or substantially interfere with educational opportunities. To the contrary, Plaintiffs and their members have been cooperative in responding to Defendants' intimidating demands that certain individuals schedule investigative interviews with University representatives.[1]

Instead, Defendants have selected an approach that "smacks of penalizing persons for their status rather than their conduct, which is constitutionally impermissible." *Gay Lib v. Univ. of Missouri*, 558 F.2d 848, 856 (8th Cir. 1977). Once again, the broad spectrum of activities affected by the Defendants' restrictions lacks a reasonable connection to maintaining a safe and healthy community.

Defendants decided to sanction every single Social Fraternity, regardless of whether each individual group (or its members) had in any way violated University policies or regulations. Simply put, unilaterally restricting the associational and speech rights of this entire fraternal and sororal community, even when some, if not most, of the members of the impacted groups have not even been accused of any misconduct, let alone found responsible for wrongdoing through a fair due process hearing, is an unjustifiable overreach by the University. Plaintiffs are more than likely to succeed at trial on this claim.

---

[1] Plaintiffs do intend to ensure that the investigatory interviews are reasonable, therefore will object to any efforts by Defendants or their representatives to conduct fishing expeditions during such interviews. *See Doe v. Rensselaer Polytechnic Inst.*, No. 20-cv-1185, 2020 WL 6118492, *12 (N.D.N.Y. Oct. 16, 2020) ("It is the fear of gambling his own future on a rigged game that plaintiff asks to be freed from, not the fear of losing the game itself."). Moreover, once this case is initiated, the undersigned counsel respectfully request that none of the represented parties be contacted directly by Defendants (or Defendants' agents), and instead all communications be directed to counsel.

iii.   Even if strict scrutiny was satisfied, Defendants have infringed upon protected liberty interests without adequate due process.

The Fourteenth Amendment to the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property without due process of law." Stated differently, a state may not withdraw established property or liberty interests "absent fundamentally fair procedures to determine whether the misconduct has occurred." *Doe v. Purdue Univ.*, 928 F.3d 652, 663 (7th Cir. 2019) (quoting *Goss v. Lopez*, 419 U.S. 565, 574 (1975)). Moreover, the "root requirement" of the Due Process Clause is that "an individual be given an opportunity or a hearing *before* he is deprived of any significant" protected interest. *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971); *see also Doe v. Univ. of Mich.*, 448 F.Supp.3d 715, 733 ("Imposing a suspension, prior to a hearing and adjudication is unconstitutional.").

Here, Defendants deprived Plaintiffs of their established liberty interests (as described above) without due process of law. Given Defendants' improper use of a system-wide, interim suspension mechanism in the absence of any true indication of an ongoing threat, coupled with the University's continued failure to provide Plaintiffs with any sort of predeprivation notice or postdeprivation remedies, Defendants have blatantly disregarded well-established legal standards of what basic notions of fundamental fairness entail in imposing—and keeping in effect—the Amended Order. Indeed, the University has deprived Plaintiffs of *any* form of due process in implementing the Amended Order that restricts their activities and speech, despite simultaneously acknowledging that there are no specific charges against individuals or organizations.

Stated differently, Defendants have failed, even upon request from the Chapters and their members, to provide any further explanation or to turn over any evidence upon which the University is relying in taking such drastic action of restricting Plaintiffs'

speech and associational rights. This places the Chapters and their members in a precarious position in which there seems to be nothing they can do to avail themselves of any procedural due process rights that all public universities must respect. These are clear violations of procedural due process requirements guaranteed under the Fourteenth Amendment.

As such, Plaintiffs will also succeed on the merits of establishing a violation of the Fourteenth Amendment, warranting the requested injunctive relief.

### C.  The Balance of Equities Continues to Favor an Injunction, as Plaintiffs Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction.

To make a showing of irreparable harm, the moving party must establish that he is subject to a continuing harm that cannot be adequately addressed by final relief on the merits and for which money damages are inadequate. *Ind. Civ. Liberties Union Found., Inc. v. Superintendent, Ind. St. Police*, 470 F.Supp.3d 888, 906 (S.D. Ind. 2020). "The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate, and injunctions protecting First Amendment freedoms always in the public interest." *Christian Legal Society v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (quoting *Joelener v. Village of Wash. Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004)).

As such, courts presume irreparable injury will occur when First Amendment rights are threatened, as "the loss of First Amendment freedoms, for even minimal amounts of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (stating that the lower court properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights.... It is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm). Further, just as courts "give deference to an association's assertions regarding the nature of its expression,

17

[so too must courts] give deference to an association's view of what would impair its expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 650, 653 (2000).

This case involves actual and ongoing harm, not merely potential or theoretical burdens on Plaintiffs' fundamental rights to freedom of association. As collegiality and social involvement are at the heart of Plaintiffs' organizational existences, any limitation on their ability to engage in social events and activities, whether they pertain to recruitment, philanthropy, community service, or general collegiality, directly threatens and impairs the organizations' very existences and longevities as organizations. And imposing arbitrary restrictions on Plaintiffs' associational rights currently burdens Plaintiffs' ability to operate and maintain internal relations and community partnerships, each of which constitute irreparable harm. *See, e.g., Cohen v. Brown Univ.*, 991 F.2d 888, 904–05 (1st Cir. 1993) (explaining that university action resulting in recruiting difficulties for athletic team constituted irreparable harm).

At the University, philanthropic and community service events are a critically important part of the activities of each of the Chapter Plaintiffs. For example, the Alpha Psi Chapter of Theta Chi Fraternity participates an in annual "Be the Match" philanthropy campaign that generates both undergraduate and alumni support to raise awareness and encourage others to register to become bone marrow donors. Meanwhile, the Epsilon Gamma Chapter of Alpha Tau Omega Fraternity engages in an annual "Clean the City" project, in which members help remove litter from the streets of Old Town, resulting in a cleaner community. The Chapter further hosted a fundraising event that generated over $4,000 last year alone for Fear2Freedom, a nonprofit organization that provides support for survivors of sexual assault. Likewise, the Epsilon Delta Chapter of Alpha Sigma Phi Fraternity's signature fundraising event supports the Rape, Abuse, & Incest National Network (RAINN), a nonprofit organization that advocates against sexual assault and abuse.

And beyond giving back to the community, the Chapter Plaintiffs also participate in various activities designed to foster professional development skills for their members. To this end, the Alpha Psi chapter hosts a "career pathways night" designed to facilitate new and active members' efforts to think about their future goals and career opportunities.

These fraternal organizations also provide critical social support systems for members. Last May, when one of the members of the Alpha Psi Chapter of Theta Chi passed away in a car accident, members offered emotional support to each other while grieving the loss of one of their own. Chapter members joined that member's family and friends for a memorial service shortly after the tragedy occurred, and even contributed to his burial costs.

But the Amended Order's directives preclude the Chapters from engaging in any of these sorts of activities, particularly when both active and new members wish to participate. These limitations on social interaction can have several detrimental impacts on the impacted individuals. For example, new members may feel isolated and alienated while they are unable to establish relationships and bonds with active members, which may hinder their ability to fully integrate into a fraternity's social structure, particularly during school breaks. Moreover, preventing interactions with older, active members denies new members opportunities to learn from their counterparts' experiences, receive mentorship, and develop valuable life skills while surrounded by people they trust. Without access to these interactions, members miss out on the very type of opportunities for personal growth and development many fraternities strive to provide to their members. In sum, an indefinite and overreaching directive limiting interactions between new and active members, along with the types of social interactions amongst members, will have far-reaching consequences, affecting the social, emotional, and developmental well-being of all parties involved, as well as a fraternity as a whole.

It is therefore clear that, each day the current sanctions are allowed to remain in effect, current University of Maryland students are being deprived of the opportunity to be part of an unrestricted fraternal experiences as members of social fraternities and sororities. These students, including the current individual Plaintiffs, continue to miss out on social events and group philanthropic engagement, the opportunity to foster brotherhood, and myriad other benefits. As such, even if Plaintiffs were not entitled to the presumption of irreparable harm—which they are—the record unquestionably demonstrates that such harm is indeed occurring, and will continue to occur absent a preliminary injunction.

Meanwhile, there is very little, if any, potential harm to Defendants if this requested injunctive relief is issued to lift the current suspension directive. In fact, the only "harm" to Defendants is that it would be forced to adhere to the Constitution and its own contractual promises in future adjudication processes, which is no harm at all. Lifting the Amended Order will not preclude the University from continuing to investigate any actual underlying allegations—whatever they may be—and, if appropriate, from proceeding with a disciplinary hearing against charged parties at a later date. But considering Defendants have already acknowledged that Plaintiffs are permitted to engage in *some* Chapter operations—such as executive board and Chapter meetings—while the overreaching investigation is supposedly conducted, there clearly is no harm in allowing the Chapters to resume *all* activities, including unspecific social events and activities. Further, if Defendants are concerned about any individual members of the Chapters posing serious risks to either the community or the University's ability to investigate the matter, Defendants retains the ability to impose individual sanctions upon those specific students. Upon information and belief, Defendants have not felt it necessary to do so as of the date of the filing of this Motion.

Accordingly, the balance of equities weighs heavily in favor of granting the requested injunctive relief to preserve the status quo until a full trial on the merits can occur.

**D.  There is No Adequate Remedy at Law for Plaintiffs.**

To demonstrate inadequacy of relief at law, a party needs to show that money damages do not provide a sufficient remedy. Here, it is readily apparent that money damages would not—and cannot—remedy Plaintiffs' loss of unrestricted associational rights stemming from Defendants' failures to comply with is contractual obligations or respect Plaintiffs' constitutional rights.

Again, Plaintiffs are social fraternities for which congeniality and social involvement are at the heart of existence. Any limitation on Plaintiffs' abilities to engage in social events and activities, whether they pertain to recruitment, philanthropy, or general collegiality, directly threatens and impairs their very existence and longevity as organizations.

Relatedly, the infringement upon the Chapters' and their members' associational rights stemming from Defendants' misconduct directly impedes Plaintiffs' abilities to form deep attachments and commitments to other members of the Chapter among whom a shared community of thoughts, experiences, beliefs, and distinctively personal aspect of their lives. Social organizations like Alpha Sigma Phi, Alpha Tau Omega, Kappa Alpha, and Theta Chi are a key means by which college students take responsibility for their own social and emotional development and identity.

Without associational autonomy, Plaintiffs will be unable to achieve and maintain the congeniality, cohesion, and stability that enable the fraternities to function as surrogate families and meet social, emotional, and cultural needs of their members. Moreover, precluding the Chapters' abilities to participate in various philanthropic activities and events and community service deprives the Chapters and their members of opportunities to improve morals, ethics, and

citizenship, and to instill in others a desire for self-improvement and a commitment to the larger community. No amount of money could ever adequately compensate Plaintiffs for the loss of such intangible benefits that stem from association with fraternal organizations.

### E.  The Public Interest Weighs in Favor of Granting the Injunction.

Public interest always favors the application for relief if the applicant demonstrates both a likelihood of success on the merits and irreparable injury. Further, it is axiomatic that the public interest always favors the application of constitutional norms and protections. *See Whole Woman's Health All. v. Hill,* 937 F.3d 864, 875 (7th Cir. 2019); *Am. Freedom Def. Initiative v. SMART*, 698 F.3d 885 (6th Cir. 2012). Here, the public has a strong interest in ensuring that public colleges and universities establish (and adhere to) policies that are in accordance with fairness, constitutional ideals and norms, and equity.

To that end, an injunction that allows Plaintiffs to immediately resume full (and unrestricted) Chapter operations, including social events and activities, philanthropic endeavors, community service, and initiation would not harm the public interest. The only apparent public interest would be a public safety issue, but, as discussed above, Plaintiffs do not pose an actual (identifiable) threat to the University community or the University's operations. And the public interest certainly should not favor a public university's ability to deprive fraternal organizations and their individual members of their constitutional rights, including their First Amendment freedom of association, without due process of law. As such, this factor also favors granting the requested injunctive relief, both in terms of maintaining the Plaintiffs' status quos and ensuring that all future disciplinary investigations and adjudications comply with constitutional and contractual guarantees.

### F. Bond Should be Waived or Set at a Nominal Amount Because Defendants Will Not Be Harmed.

Lastly, Plaintiffs move the Court to waive security for any injunction that may issue. Strict adherence to Federal Rule 65(c) can be waived by courts. Where an enjoined party is unlikely to suffer monetary damages or harm, it is within the court's discretion to fix a "nominal bond" or a "bond amount at zero." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,* 174 F.3d 411, 421 n.3 (4th Cir. 1999); *see also Coreas v. Bounds*, 457 F.Supp.3d 460, 464 (D. Md. 2020) ("the Court will not require a bond in this case"). Specifically, when there is no danger that the opposing party will incur any damages from the injunction, a court may choose not to require a bond. *See Md. Dept. of Human Resources v. U.S. Dep't. of Agriculture,* 976 F.2d 1462, 1483 n.23 (4th Cir. 1992) (recognizing a district court's discretion to set a bond amount of zero where the enjoined or restrained party faces no likelihood of material harm). In this matter, Defendants are not at risk of any monetary loss if the Court grants Plaintiffs' requested injunctive relief. As such, bond can be waived or, alternatively, set at a nominal amount not exceeding $100.00.

### II. CONCLUSION

Due to Defendants' interference with Plaintiffs' constitutional rights without due process of law, Plaintiffs have been wrongfully sanctioned and suspended by Defendants, which will undoubtedly have a devastating impact on the Chapters and their members. Plaintiffs have strong claims against Defendants and, as such, have clearly demonstrated more than just a likelihood of success on the merits of their claims. Due to the severity of the irreparable harm, especially when compared to the non-existent harm or other impact injunctive relief would have on Defendants, Plaintiffs should be granted injunctive relief enjoining the University and its representatives from continuing to restrict in any manner the Plaintiffs' full communications, operations, events, or activities during the pendency of this litigation.

Respectfully submitted,

/s/Micah E. Kamrass
Micah E. Kamrass (OH Bar No. 0092756)*
Ilana L. Linder      (OH Bar. No. 0095622)*
Sean P. Callan      (OH Bar. No. 0062266)*
*Pro Hac Vice forthcoming
MANLEY BURKE, LPA
225 W Court Street
Cincinnati, Ohio 45202
Phone: (513) 721-5525
Email: mkamrass@manleyburke.com
       ilana.linder@manleyburke.com
       sean.callan@manleyburke.com

/s/Alfred D. Carry
Alfred D. Carry (#20711)
Robert N. Driscoll (pro hac vice forthcoming)
MCGLINCHEY STAFFORD PLLC
1275 Pennsylvania Ave. NW; Suite 420
Washington, DC 20004
Phone: (202) 802-9951
Fax: (202) 330-5897
Email: acarry@mcglinchey.com
       rdriscoll@mcglinchey.com

*Attorneys for Plaintiffs*