**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

ALPHA PSI CHAPTER OF THETA CHI     *
FRATERNITY, *ET AL.*

            *Plaintiffs*,     *

       *      No. 8:24-cv-00753-DLB

       v.     *

JAMES BOND, *ET AL.*,     *

            *Defendants*.

*     *     *     *     *     *     *     *     *     *     *

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION**

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Lillian L. Reynolds

_____

LILLIAN L. REYNOLDS
Federal Bar No. 30225
KATHRYN J. BRADLEY
Federal Bar No. 21242
Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place, 17th Floor
Baltimore, MD 21202
lreynolds@oag.state.md.us
(410) 576-6481
(410) 576-6437 (facsimile)

March 15, 2024        Attorneys for Defendants

## TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................. 4

STATEMENT OF FACTS ................................................................... 5

LEGAL STANDARD ......................................................................... 12

ARGUMENT....................................................................................... 13

I.   PLAINTIFFS' MOTION IS MOOT BECAUSE THE UNIVERSITY HAS RESCINDED
THE ORDERS AT ISSUE.................................................................... 13

II.   PLAINTIFFS HAVE FAILED TO ESTABLISH THE LIKELIHOOD OF SUCCESS ON
THE MERITS. ................................................................................... 14

    A.   The University's Imposition of Interim Measures was Narrowly Tailored to
Address the Compelling Governmental Interest of Protecting the Health and
Safety of Students. ........................................................................ 14

    B.   Plaintiffs' Due Process Rights Were Not Violated. .................................. 17

III.   THE BALANCE OF EQUITIES WEIGHS AGAINST AN INJUNCTION. ................. 23

IV.   PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN
INJUNCTION. ................................................................................... 28

V.   GRANTING AN INJUNCTION IS AGAINST THE PUBLIC INTEREST. ................. 29

CONCLUSION ................................................................................... 30

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| ALPHA PSI CHAPTER OF THETA CHI FRATERNITY, *ET AL.* | * | |
| *Plaintiffs*, | * | |
| | * | No. 8:24-cv-00753-DLB |
| v. | * | |
| | * | |
| JAMES BOND, *ET AL.*, | * | |
| *Defendants*. | | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION**

Defendants (collectively, the "University") submit this Memorandum in Opposition to the Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction. The motion should be denied. First, the issues in dispute in this case are now moot, because on March 15, 2024, the University lifted the March 1 and March 6 orders imposing a temporary restriction (or pause) on new member recruitment activities and social activities involving alcohol in IFC and PHA chapter organizations. *See* Ex. 10, Campus Wide Communication dated March 15, 2024. Second, to the extent that the matter is not now moot, the University was fully authorized pursuant to its Code of Student Conduct to impose limited, temporary restrictions on some chapter activities while it investigated serious and persistent allegations of hazing and alcohol abuse at multiple chapters which threatened the health and safety of its students. *See* Ex. 2, Code of Student Conduct, Section IX.D ("A Cease and Desist notice may be issued to Student Groups or Student Organizations whose continued operation poses a threat to the health and safety of the University community.").

## INTRODUCTION

As an initial matter, this matter is now moot and the motion should be summarily dismissed.  Plaintiffs' complaint and motion are based entirely on the University's imposition of a ban on certain activities of all chapters within the Interfraternity Council ("IFC") and the Panhellenic Association ("PHA").  *See* Motion at 1. They challenge whether the University was authorized under its Code of Student Conduct and constitutionally to impose the March 1 (as clarified on March 6) prohibition of some activities of IFC and PHA member chapters.  Plaintiffs do not dispute the University's right to investigate claims of misconduct or to impose interim measures under the Code of Student Conduct.  *See* Motion at 3-4.  They claim, however, that the March 1 Order was not authorized because it was issued to all IFC and PHA chapters, and not individual chapters based on individual allegations.  They seek as relief an order relieving them from the obligation to comply with the March 1 and 6 limited ban on chapter activities.

This matter is now moot.  On March 15, 2024, the University completed its initial investigation – as it had told the campus community it intended to do – and informed the community that "effective immediately, we are lifting the temporary pause on new member and alcohol-related activities, and related no-contact orders which the University issued on March 1, 2024."  *See* Ex. 10.  Therefore, the March 1 and 6 orders which are the subject matter of the complaint and motion are no longer in force.  This case is moot.

The University also announced that 32 chapters have been cleared to return to normal activities.  *See id.*   This includes three of the four plaintiff chapters - Theta Chi, Alpha Sigma Phi, and Alpha Tau Omega.  Therefore, as to these three plaintiffs, there are *no* pending restrictions on their chapter activities.  The University has continued its investigation against Plaintiff Kappa Alpha Order ("KAO"), based on serious allegations of hazing and alcohol abuse.  The University

4

has issued KAO with a specific notice of the investigation, the nature of the allegations against it, the terms of a revised cease and desist order, and the next steps in the investigation - all in accordance with the Code of Student Conduct (Ex. 2, at Section IX) and pursuant to process Plaintiffs acknowledged was permissible.   Therefore, without waiving in any way the appropriateness of the University's actions in imposing the March 1 order, Plaintiffs' claims are now moot and the motion, and complaint, should be dismissed.

Second, even if the case is not now moot, the motion should be denied because the University was fully justified in enacting a limited, temporary cease and desist order to limit chapter activities in light of numerous specific allegations and reports of hazing and alcohol abuse at chapter new member and social functions.   The University acted out of concern for the health and safety of its students – *including Plaintiffs and their members* – and in a manner that was fully consistent with its rights under the Code of Student Conduct to issue interim cease and desist orders when there were reasonable and serious concerns about chapter activities that endangered the health and safety of its campus community.   *See* Ex. 2, Code of Student Conduct, Section IX.D.2. The basis for this decision is discussed below.

## STATEMENT OF FACTS

### Relevant Policies Applicable to Council Chapters and their Members

The University recognizes eligible fraternities and sororities, also known as chapters, as student organizations. Ex. 1, Bond Aff. at ¶ 3.   The University's chapters are governed by four councils:   the Interfraternity Council ("IFC"), the Multicultural Greek Council ("MGC"), the National Pan-Hellenic Council ("NPHC"), and the Panhellenic Association ("PHA").   The vast majority of University students who are members of Greek organizations are members of chapters governed by the IFC and the PHA.   Ex. 1, Bond Aff. at ¶ 3.   These chapters generally engage in

recruitment activities for a period of six to eight weeks beginning in or around February of each year.  Ex. 1, Bond Aff. at ¶ 3.

University students and student organizations, including chapters, are subject to the University's Code of Student Conduct (the "Code of Conduct").  Ex. 1, Bond Aff. at ¶ 4; Ex. 2. The Code of Conduct strictly forbids, among other things, students and student organizations from engaging in hazing, defined by the University's Policy and Procedures on Hazing as reckless or intentional conduct, for the purposes of admission, initiation, or continued association with a group or organization, that  subjects another person to:  the risk of physical harm; emotional distress, humiliation, degradation; harm from unreasonable requirements which interfere with a student's ability to function as a student; diminished physical or mental capacity; or causes or encourages another person to violate any law or University regulation. Ex. 2 at 5; Ex. 3.  The Code of Conduct also prohibits the unauthorized use or possession of any controlled substance or illegal drug, providing alcohol or alcoholic beverages to underage persons, and the illegal consumption or possession of alcohol.  Ex. 2 at 5-6.  Additionally, the Code of Conduct prohibits the failure to comply with a directive of University officials.  Ex. 2 at 7.

The Code of Conduct contains the process for the University's review of student conduct, including that of student organizations.  That process commences when the Office of Student Conduct ("OSC") receives and reviews a referral[1] alleging a violation of the Code of Conduct.  Ex. 2 at 9.  OSC determines what steps to take in response to the referral, if any, including whether to impose interim measures.  Ex. 2 at 9-10.  The Code of Conduct authorizes OSC to impose, as an interim measure, a Cease and Desist notice to student organizations, including chapters, "whose

---

[1] A "referral" is defined as a report, complaint, or allegation of prohibited conduct against a student, student group, or student organization.  Ex. 2 at 3.

continued operation poses a threat to the health and safety of the University community." The Code of Conduct further states:

> Directives to Cease and Desist may be effective immediately without prior notice to the Student Group or Student Organization if there is evidence that the continued presence and operation of the Student Group or Student Organization poses a substantial threat to the health and safety of their members or others in the community (e.g., hazing allegation).

Ex. 2 at 10.  The Code of Conduct also allows OSC to institute No Contact Orders in response to a referral.  Ex. 2 at 10.  "No Contact Directives are effective immediately without prior notice to Students whenever there is evidence that the continued interaction of the Student with other particular members of the University community poses a substantial threat to themselves or others, or to the stability and continuation of normal University operations including, but not limited to individuals' educational or work environments."  Ex. 2 at 4.

The Code of Conduct further provides that OSC can conduct preliminary interviews in response to a referral.  There is no requirement that any written notice of complaints be provided to a party prior to a preliminary interview; rather, the allegations can be discussed during the initial meeting.  Ex. 2 at 10.

**The University Receives Multiple Reports Alleging Violations of the Code of Conduct by Council Chapters and Issues Limited Temporary Restrictions to Chapter Members**

On or around February 22, 2024, OSC received two referrals alleging Code of Conduct violations by Fraternity 1[2], a member of the IFC.  Ex. 1, Bond Aff. at ¶ 6.  Specifically, a resident director reported that, during residence inspections on February 20, 2024, he found multiple

---

[2] The University is currently in the process of investigating the allegations against several chapters who are not parties to this proceeding but has not substantiated the allegations of misconduct against them.  Therefore, to protect the privacy of these third-party chapters, the University will identify them as Fraternity 1, Fraternity 2, etc.

prohibited substances and drug paraphernalia in the fraternity house of Fraternity 1.  Ex. 1, Bond Aff. at ¶ 6.  OSC also received an anonymous report from a parent that their son was being subjected to harmful hazing by Fraternity 1, including being required by the chapter to stay outside in the cold for several hours on the evening of February 21, 2024, which necessitated a trip to the University Health Center for suspected hypothermia, cleaning the off-campus houses of chapter members (known as "satellite houses"), and scrubbing floors until 2:30 am.  Ex. 1, Bond Aff. at ¶ 6; Ex. 4.  Following OSC's receipt of these referrals, on February 27 and 28, 2024, OSC interviewed members of Fraternity 1, who provided inconsistent and apparently false statements to OSC investigators.  Ex. 1, Bond Aff. at ¶ 7.

On the evening of February 27, 2024, OSC received an anonymous email referral alleging that multiple unidentified fraternities[3] were engaged in hazing activities with new members, including:  being beaten with a paddle; being burned with cigarettes and torches; having to lay on nails; "[b]eing forced to consume things that are not food (an alive fish, chewing tobacco, urine)"; being spit on; and being forced to clean chapter members' residences.  Ex. 1, Bond Aff. at ¶ 8; Ex. 5, redacted referral.  The anonymous reporter also alleged to have personally experienced:

> Being forced to attend a "Line Up" at which they abuse you for hours on end (5 in my experience) where they force you to wall sit, do push ups, plank, intentionally harm oneself, be naked/in underwear for the purpose of public humiliation, and be physically assaulted.  At one of these events one individual passed out as they refused to provide us with water and forced us to drink straight vodka and they did nothing to help him, in fact they hit him in the face with a plastic bat and poured beer on him until he woke up.

Ex. 5, referral.

---

[3] The author referred to having spoken with 20 members in at least eight different unidentified chapters.  Ex. 5.

As a result of the serious nature of the alleged widespread conduct described in the February 27, 2024, referral, Kevin Pitt, Assistant Dean of Students, Tyler Huddleston, Assistant Director, Advising and Programming, and Dr. James McShay, Assistant Vice President, Division of Student Affairs, met with the chapter presidents on the evening of Thursday February 29, 2024, to address the allegations described in the February 27, 2024, referral and to reinforce the University's policies prohibiting hazing and alcohol use. Ex. 6, Pitt Aff. at ¶ 2. Mr. Pitt presented a general overview of the concerns raised in the February 27 referral, including that there were allegations of widespread physical abuse and dangerous rituals, severe mental and emotional distress, financial exploitation and forced labor, drug and alcohol abuse, and a general atmosphere of fear and intimidation. Ex. 6, Pitt Aff. at ¶ 3. Mr. Pitt specifically mentioned that there were allegations of "line-ups" and bodily harm, including some involving human waste, and that the allegations included criminal acts that are against Maryland law[4] and University policy. Ex. 6, Pitt Aff. at ¶ 3. During this meeting, chapter leadership was advised that the University would take action in response to further allegations of prohibited conduct, including a pause of new member activities across one or all of the councils. Ex. 6, Pitt Aff. at ¶ 4. Mr. Pitt, Mr. Huddleston, and Dr. McShay offered chapter leadership the opportunity to ask questions and several chapter leaders posed questions about the process. Ex. 6, Pitt Aff. at ¶ 5. The administrators also distributed index cards and offered chapter leaders the opportunity to confidentially seek support for chapters (their own or others) that may need assistance in addressing hazing activities and harmful traditions. Ex. 6, Pitt Aff. at ¶ 5. Finally, the administrators encouraged chapter leaders to contact them via email following the meeting with questions or concerns. Ex. 6, Bond Aff. at ¶ 5. The chapter leaders

---

[4] Hazing is a misdemeanor offense under Maryland law, subject to imprisonment of up to six months, a fine not to exceed $500, or both. Md. Code Ann., Crim. Law § 3-607.

and members at the meeting did not provide any additional substantive information that suggested that they were not engaged in the alleged misconduct, nor did they provide further information to clarify which fraternities or sororities were responsible for the allegations. Ex. 6, Bond Aff. at ¶ 5. None of the fraternity or sorority leaders contacted Mr. Pitt in the days after the meeting, by e-mail, phone, or in person. Ex. 6, Bond Aff. at ¶ 6

Several hours after meeting with the chapter presidents about appropriate conduct, in the early morning hours of March 1, there were two separate incidents of alcohol transports[5] involving excessive alcohol consumption by new members of PHA chapters who had reportedly attended chapter events on the evening of February 29, 2024.  Ex. 1, Bond Aff. at ¶ 10.  OSC received referrals relating to these incidents on Friday March 1, 2024.  Ex. 1, Bond Aff. at ¶ 10. Additionally, in the morning of March 1, OSC received an anonymous referral from the mother of a new member of Fraternity 2 alleging hazing by the chapter, including locking new members in the basement and breaking glass on the floor for the new members to clean up.  Ex. 1, Bond Aff. at ¶ 11; Ex. 7.  OSC also reviewed data from the University's Health and Counseling Centers and found there was a troubling uptick in visits to both Centers by IFC and PHA chapter members during the month of February.  Ex. 1, Bond Aff. at ¶ 12; Ex. 8.

Based on the totality of information received by the University as of March 1, and concerns about ongoing violations of the Code of Conduct relating to hazing and alcohol and drug use, OSC determined that immediate action was warranted to prevent harm to the University's students, particularly since it was anticipated that there would be many recruiting activities and social events by the chapters in the coming weekend.  Ex. 1, Bond Aff. at ¶ 13.  Consequently, OSC determined

---

[5] An "alcohol transport" is an incident where a student is transported off campus by an emergency responder to a healthcare facility due to excessive alcohol consumption.  Ex. 1, Bond Aff. at ¶ 9.

that it would place a *temporary* interim cease and desist order, consistent with the Code of Conduct, relating to two specific activities by chapters: (1) hosting social events where alcohol is served; and (2) conducting new or prospective member activities. Compl. Ex. B. Because the February 27 referral alleged widespread hazing across multiple unnamed chapters and because of the nature and extent of the other evidence described above, the cease and desist order was imposed on all IFC and PHA chapters so that the University could have an opportunity to thoroughly but expeditiously investigate the allegations and identify specific chapters, if any, that were allegedly involved in hazing. The intent of the no contact restriction was to protect vulnerable underclassmen who are new or prospective members of chapters from being subjected to hazing as well as to maintain integrity in the investigation of the serious allegations set forth in the February 27 referral. Ex. 1, Bond Aff. at ¶ 13.

On March 6, as a result of questions regarding the applicability of the no contact order to non-Greek-letter organization-related matters, OSC issued a clarification of such order that provided that the only contact with new or prospective members was contact relating to Greek-letter organization-related activities and, therefore, communications, for example, about University course-work, employment operations, or any other matter unrelated to Greek-letter organization-related activities was not prohibited. Compl. Ex. C.

**The University Promptly Engages an Outside Firm to Investigate the Allegations of Misconduct**

Following the decision to implement interim measures on March 1, the University promptly engaged INCompliance, an outside consulting firm, to interview students for the purpose of gathering information about the activities of chapters during the preceding weeks. Ex. 1, Bond Aff. at ¶ 14; Ex. 9. Beginning on March 11, investigators interviewed over 150 chapter members

regarding their experiences with Greek life on campus.[6]  Ex. 1, Bond Aff. at ¶ 15.  As of the afternoon of March 15, INCompliance's preliminary factfinding investigation has concluded, and the University has lifted the interim measures set forth in the March 1 and 6, 2024, notices. Ex. 1, Bond Aff. at ¶ 15; Ex. 10, notice of recission.  As a result of evidence suggesting involvement in, or responsibility for, hazing or other incidents that threatened the health and safety of the campus community, the University is continuing its investigation of five chapters by the OSC, pursuant to the Code of Student Conduct, and these chapters will continue to be subject to limited restrictions, via individualized notices of investigation/interim cease and desist orders, on their activities while the investigation continues.  *See id*. One of the five chapters is KAO, a plaintiff in this lawsuit. Ex. 11. The University sent KAO a notice of allegations on March 15, 2024, which stated that "it is alleged that Kappa Alpha Order Fraternity has engaged in various physical/emotional hazing activities during the new member process in the spring 2024 semester, including requiring tasks/errands of prospective new members, alcohol distribution to individuals under the legal drinking age, and high risk drinking behaviors." Ex. 11. The University's letter also stated that it "shall also serve as a cease and desist order prohibiting Kappa Alpha Order Fraternity from continuing its new member education program at this time" and hosting "social events where alcohol is present." Ex. 11.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 65(a), a court may issue a preliminary injunction upon the requisite showing at a hearing.  A preliminary injunction seeks to "preserve[s] the status

---

[6] Contrary to Plaintiffs' contentions during the March 14, 2024, conference call with the Court, the interviewers never prohibited any students from having an advisor, legal or otherwise, present during their interviews and never demanded that any students turn over their phones. Indeed, upon information and belief, counsel for Plaintiffs served as advisors during some of the interviews.

quo pending a final trial on the merits," and thus will stand in effect for an "indefinite duration." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999).  As such, it is "an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A plaintiff must make a clear showing of entitlement to such relief.  *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).

To obtain preliminary injunctive relief, plaintiff must establish four factors: (1) that he is "likely to succeed on the merits;" (2) that he is "likely to suffer irreparable harm" absent injunctive relief; (3) "that the balance of equities tips in his favor;" and (4) that injunctive relief is in the "public interest."  *Winter*, 555 U.S. at 20; *see also WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009).  Injunctive relief "should be no more burdensome to the defendant than necessary," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994), and a court should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24.

The substantive standards for granting a motion for a temporary restraining order and entering a preliminary injunction are the same.  *Virginia v. Kelly*, 29 F.3d 145, 147 (4th Cir. 1994).

## ARGUMENT

### I.   PLAINTIFFS' MOTION IS MOOT BECAUSE THE UNIVERSITY HAS RESCINDED THE ORDERS AT ISSUE.

Plaintiffs' motion for temporary restraining order and preliminary injunction should be denied because the University has rescinded the interim measures challenged by Plaintiffs and, as a result, Plaintiffs' motion is moot.  Specifically, as of the filing of this opposition, the interim measures described in the March 1 and 6 notices have been lifted and are no longer in effect.  Ex.

10.  As a result, there is simply no need for a temporary restraining order or preliminary injunctive relief in this case.

## II.     PLAINTIFFS HAVE FAILED TO ESTABLISH THE LIKELIHOOD OF SUCCESS ON THE MERITS.

Although Plaintiffs' motion seeking injunctive relief should be denied as moot, it should additionally be denied because Plaintiffs' have failed to establish all four elements that are required to warrant the extraordinary measure of injunctive relief.  Specifically, they have not established the likelihood of success on the merits, that the balance of equities tips in their favor, that they will suffer irreparable harm without an injunction, or that public interest favors injunctive relief. *Winter*, 555 U.S. at 20; *see also Doe v. Wake Forest Univ.*, No. 1:23-CV-00114, 2023 WL 2239475, at *1–2 (M.D.N.C. Feb. 27, 2023) (citing *Winter*, 555 U.S. at 20, 24) (holding that all four *Winter* factors must be established to warrant injunctive relief).  As such, Plaintiffs' motion should be denied.

### A.  The University's Imposition of Interim Measures was Narrowly Tailored to Address the Compelling Governmental Interest of Protecting the Health and Safety of Students.

In counts I and II of their complaint, Plaintiffs assert that the interim measures imposed temporarily by the University from March 1 through March 15, 2024, violated Plaintiffs' first amendment rights to freedom of speech and freedom of association.  As set forth below, the institution of the two-week restriction on chapter recruiting activities served a compelling governmental interest and was narrowly tailored to achieve that interest under the circumstances.

In First Amendment cases, there are three different types of forums:  traditional public forums, non-public forums, and limited public forums.  *ACLU v.* Mote, 423 F.3d 438, 443 (4th Cir. 2005).  A limited public forum "is one that is not traditionally public, but the government has purposefully opened to the public, or some segment of the public, for expressive activity."  *Id.* at

443.  The Fourth Circuit has determined that the University's campus is a limited public forum.
*Id.* at 444.  Because Plaintiffs are "within the class to which [the University] is made generally available," any restrictions on Plaintiffs' speech are subject to strict scrutiny.  *Id.*  In other words, the challenged restrictions must be "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

At the same time, the Supreme Court has "recognized that First Amendment rights must be analyzed in 'light of the special characteristics of the school environment.'"  *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981) (quoting *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 506 (1969)).  "A university differs in significant respects from public forums such as streets or parks or even municipal theaters.  A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities."  *Id.*

It cannot be disputed that protecting the health and safety of students from hazing and medical emergencies caused by excessive alcohol consumption are compelling governmental interests.  Indeed, under Maryland law, hazing is a criminal offense.  *See* Md. Code Ann., Crim. Law § 3-607.  In *McKenzie v. State*, 131 Md. App. 124 (2000), the Court of Appeals of Maryland held that Maryland's anti-hazing statute is constitutional, and discussed the State's interest in prohibiting hazing:

> Group initiations . . . should not entail violence or endanger would-be members. This State should keep its students safe in situations where peer pressure and the fear of losing face propels initiates to submit to conduct that strays well beyond the boundaries of criminal liability.
>
> *  *  *
>
> We find that the legislative records, along with our research, support our view that Maryland has a compelling interest in preventing violence or dangerous initiation

15

activities on campuses, and that the student groups regulated by this statute lose no significant First Amendment freedoms when it is enforced.

*McKenzie*, 131 Md. App. at 147, 148-49.  *See also Widner*, 454 U.S. at 268 n.5 (a university has the "authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities.").

Here, the temporary interim measures imposed by the University were necessary because credible allegations of specific conduct and data suggested that such conduct was escalating and, despite attempting to provide guidance to the chapters during a meeting on February 29, 2024, violations were continuing to occur, as evidenced by two alcohol transports of individuals who reportedly attended chapter events on the evening of February 29 and a complaint by a parent alleging hazing on March 1.  As a result, the University concluded that the narrowest restriction that could be imposed was to temporarily limit contact between current members of the chapters and new members to prevent any further hazing or alcohol related incidents until the University could investigate the allegations and ascertain the identities of any chapters that were involved. The University undertook its investigation into the allegations as expeditiously as possible, completing its interviews with dozens of chapter members in a five-day period.  As soon as the interviews were completed, the University promptly lifted the temporary interim measures.

In short, the University imposed the least restrictive alternative possible in achieving its compelling interest of promptly identifying any chapters engaging in potentially life-threatening activities, including hazing, while simultaneously preventing new or prospective chapter members from harm pending such investigation.  As a result, the University's actions survive strict scrutiny and should be upheld.

### B.  Plaintiffs' Due Process Rights Were Not Violated.

Plaintiffs allege that Defendants, in their official capacities, violated their liberty interests without due process of law in violation of the Fourteenth Amendment.  Compl. at ¶¶ 68-72. Specifically, Plaintiffs allege that they have constitutionally protected liberty interests in the expressive associational rights of their chapters' members, ECF No. 2-1 at 9, and that Defendants violated those interests without due process by imposing "a system-wide, interim suspension" that prohibited contact between current members and new or prospective members "without predeprivation notice or postdeprivation remedies." ECF No. 2-1 at 16.  Plaintiffs' complaint also alleges that Defendants violated the University of Maryland's Student Code of Conduct by entering the "no contact order" without evidence that continued interaction between the affected students created a "substantial threat to themselves or others, or to the stability and continuation of normal University operations including but not limited to individuals' educational or work environments." Compl. ¶ 71.

To succeed on their procedural due process claim, Plaintiffs must "show (1) a cognizable 'liberty' or 'property' interest; (2) the deprivation of that interest by 'some form of state action'; and (3) that the procedures employed were constitutionally inadequate." *Iota Xi Chapter Of Sigma Chi Fraternity v. Patterson,* 566 F.3d 138, 145 (4th Cir.2009) (quoting *Stone v. Univ. of Md. Med. Sys. Corp.,* 855 F.2d 167, 172 (4th Cir. 1988)).  Plaintiffs' due process claim falters first because they have not established that the no contact order between new members and current members about Greek-letter organization-related activities violated their right to expressive association.  The First Amendment protects "expressive association," which is the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609,

618 (1984)).  Plaintiffs' right to expressive association was not implicated by the University's orders prohibiting the chapters from hosting social events, on or off campus, where alcohol is present.  Indeed, current members were free to participate in expressive events so long as alcohol was not present.

Nevertheless, even assuming that Plaintiffs plausibly allege that the suspension of contact between new and current members violated their right to expressive association, their due process claim still fails because Plaintiffs were provided with sufficient process.  Defendants provided Plaintiffs with notice of the general and serious allegations of hazing against many fraternities and sororities and an opportunity to respond during the meeting held on February 29, 2024.  Mr. Pitt, Mr. Huddleston, and Dr. McShay met with chapter leaders to discuss the allegations described in the February 27, 2024, referral and to reinforce the University's policies prohibiting hazing and alcohol use. Approximately 100 students were present during this meeting.  Mr. Pitt discussed the multiple, anonymous allegations of physical abuse, severe mental and emotional distress, financial exploitation and forced labor, drug and alcohol abuse, and the general atmosphere of fear and intimidation. The administrators specifically advised chapter leaders that the University would take action in response to further allegations of prohibited conduct, including pausing new member activities across all councils. Chapter leaders had the opportunity to ask questions, provide information anonymously on index cards, and contact the administrators via email following the meeting with questions or concerns. The administrators received no additional substantive information from chapter leaders about the allegations.  Therefore, following the two serious alcohol transports in the early morning hours of March 1, the additional anonymous referral about hazing by Fraternity 2, and the analysis of data from the University's Health and Counseling Centers, the University determined that it was necessary to issue the temporary cease and desist

order to suspend contact with new and prospective members to prevent further harm to students while it investigated all of the allegations.

Due process requires only "notice and a meaningful opportunity to be heard." *Iota XI Chapter of the Sigma CHI Fraternity v. Patterson*, 538 F. Supp. 2d 915, 924–25 (E.D. Va. 2008), *aff'd on other grounds, Patterson*, 566 F.3d 138 (citing *Tigrett v. Rector & Visitors of Univ. of Va.*, 290 F.3d 620, 630 (4th Cir.2002)). The "process due is flexible and depends on context" *Doe v. Virginia Polytechnic Inst. & State Univ.*, 77 F.4th 231, 236 (4th Cir. 2023) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)) and "requires analysis of the governmental and private interests that are affected." *Mathews*, 424 U.S. at 334. Determining what process is due in light of those interests requires consideration of three factors: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

For the first factor, as set forth above, Plaintiffs have not demonstrated a private, constitutionally protected interest in their current members communicating with new or prospective members about Greek life. *See, e.g., Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 444 (3d Cir. 2000), *as amended* (Nov. 29, 2000) (holding that fraternity did not have a constitutionally protected expressive association because the chapter did not take a public stance on any issue of public, political, social, or cultural importance and "[a] few minor charitable acts do not alone make a group's association expressive . . . .").

In contrast, under the third factor, the University's interests are clear and significant. "[E]ducation is perhaps the most important function of state and local governments." *Goss v. Lopez,* 419 U.S. 565, 576 (1975) (quoting *Brown v. Board of Education,* 347, U.S. 483, 493 (1954)).  Courts have recognized the interests of a university in "preserving . . . resources to serve its primary function of education," "protecting vulnerable witnesses," and "providing a safe environment for" students. *Walsh v. Hodge*, 975 F.3d 475, 484 (5th Cir. 2020); *Williams v. Pennsylvania State Univ.*, No. 4:20-CV-00298, 2023 WL 6626789, at *27 (M.D. Pa. Oct. 11, 2023) (noting that universities have well-established interests including "maintaining safety on its campus and within its student body [as well as] a strong interest in allocating resources to best achieve its educational mission and the educational component of its disciplinary process.") (citation and internal quotation marks omitted); *Caldwell v. Univ. of New Mexico Bd. of Regents*, 510 F. Supp. 3d 982, 1052 (D.N.M. 2020) (citing cases in in support of a university's interest in maintaining a safe environment and preserving its resources).  Based on the culture of secrecy governing the activities of the University's fraternities and sororities, the recent reports of potentially deadly and unlawful activities by multiple fraternities and sororities, and the concern that current members would coach new members during any investigation, Defendants had an important interest in investigating the serious allegations of risks to students' health and safety without interference and coaching by current members and without allowing dangerous hazing activities to continue.

Because of the important interests at stake, "[i]n the academic setting particularly, the Supreme Court has recognized that the requirements of due process may be satisfied by something less than a trial-like proceeding." *Henson v. Honor Comm. of U. Va.*, 719 F.2d 69, 74 (4th Cir. 1983).  Imposing "even truncated trial-type procedures might well

overwhelm administrative facilities . . . and . . . cost more that it would save in educational effectiveness." *Goss,* 419 U.S. 563.  Here, the fraternities and sororities had notice of the allegations during the meeting on February 29 and an opportunity to comment on them and provide additional information during that meeting and afterwards, including anonymously.  Given the limited duration and scope of the University's restriction, this was sufficient to meet basic due process requirements.

Moreover, the U.S. Supreme Court has recognized that, in the educational context, prior notice and a hearing are not always required, *even for students who are suspended from accessing their education*.  "[T]here are recurring situations in which prior notice and hearing cannot be insisted upon.  Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school," with notice and a rudimentary hearing to follow "as soon as practicable." *Goss,* 419 U.S. at 582. Here, the University's clarified order did not interfere with Plaintiffs' ability to access their education; it affected only Plaintiffs' ability to engage in pledging activities with new members over a two-week period.

Plaintiffs have similarly failed to demonstrate how they have met the second factor, i.e. the risk of erroneous deprivation of their expressive association through the procedures used and the probable value of additional or substitute procedural safeguards. *Mathews*, 424 U.S. at 335. Plaintiffs have not alleged any specific procedural or substitute safeguards the University should have used to prevent the risk of erroneous deprivation.  Indeed, there is no dispute that University administrators met with student chapter leaders on February 29 and told them that the University had received multiple recent anonymous reports of serious allegations of hazing across multiple fraternities and sororities.  The administrators warned student leaders that the University would

pause new member activities across all councils if they received further allegations of prohibited conduct. The chapter leaders had an opportunity to ask questions and provide comments but did not provide information to the administrators that suggested that they were *not* engaged in the misconduct, nor did they provide further information to clarify which fraternities and sororities *were* responsible for the allegations. Because of the widespread nature of the allegations of hazing and the culture of secrecy in the University's fraternities and sororities, the University could not identify which individuals in which fraternities or sororities were engaging in misconduct prior to issuing the no contact order. Therefore, following the two serious alcohol transports in the early morning hours of March 1, the additional anonymous referral about hazing, and the analysis of data from the University's Health and Counseling Centers, the University determined that it was necessary to issue the temporary cease and desist order while the University investigated the allegations. During the preliminary investigation of the allegations by INCompliance, members of fraternities and sororities had additional opportunities to be heard by investigators about the existence of hazing activities in their chapters and had the opportunity to contact Mr. Pitt, Mr. Huddleston, and Dr. McShay about the no contact order. Further, members had the opportunity to appear before investigators with advisors, including attorneys.

The University's February 29 meeting provided Plaintiffs with notice and an opportunity to be heard prior to the alleged deprivation and additional opportunities for Plaintiffs to be heard thereafter. Given the significant evidence that continued interaction between the new and prospective members and current members would create a substantial threat of harm to new members, the process provided to Plaintiffs prior to completion of the investigation complied with University policy and satisfied due process requirements.

III.   **THE BALANCE OF EQUITIES WEIGHS AGAINST AN INJUNCTION.**

Even if Plaintiffs could establish the likelihood of success on the merits, the injunction should still be denied because the balance of equities and public interest strongly weigh against an injunction, and Plaintiffs have not shown that they will suffer irreparable harm without injunctive relief.   Although Plaintiffs suggest that the University has no interests at stake and would suffer no harm if the injunction were granted, ECF No. 2-1 at 20 (asserting that "there is very little, if any, potential harm to Defendants if this requested injunctive relief is issued"), this overlooks well-settled law establishing that the University and the public have significant and compelling interests here, which weigh heavily against granting an injunction.

It is well-established that "Maryland has a compelling interest in preventing violent or dangerous initiation activities on campuses." *McKenzie*, 131 Md. App. at 148–49.  This interest is so compelling, in fact, that it led to the enactment of anti-hazing legislation in Maryland which criminalizes certain hazing conduct.  *See id*.; Md. Code Ann., Crim. Law § 3-607.  As set forth above, under this law, a person who "recklessly or intentionally do[es] an act or create[s] a situation that subjects a student to the risk of serious bodily injury for the purpose of an initiation into a student organization of a school, college, or university" and is subject to imprisonment for up to six months and a fine of $500.  Crim. Law § 3-607.  In upholding the constitutionality of this law against a First Amendment challenge in *McKenzie v. State*, the Supreme Court of Maryland held that "[t]his State should keep its students safe in situations where peer pressure and the fear of losing face propels initiates to submit to conduct that strays well beyond the boundaries of criminal liability." *McKenzie*, 131 Md. App. at 147.  The Court went on to express its grave concern about "[a] series of campus tragedies in Maryland and other states," and declared that "[g]roup initiations … should not entail violence or endanger would-be members."  *Id*.

University policy accords with this compelling interest by not only prohibiting hazing, like Maryland's anti-hazing law, but in addition, by allowing the University to take immediate and interim steps, merely upon receiving a report of alleged hazing, to protect its students prior to completion of its investigation. *See* Ex. 2, Code of Conduct at Section II.E.  Such interim measures may include a "no contact" directive prohibiting "the organization or its members" from having "verbal, electronic, written, or third party communication with one another or with the student(s) seeking membership," as well as an order to "cease and desist" from all of an organization's activities. *Id*.  Notably, Plaintiffs do not challenge this policy provision, nor can they, as it aligns with Maryland's compelling interest and comports with the law.  Yet, the University's cease and desist order in this case, which Plaintiffs do challenge, were the very type of interim measures permitted by this policy.  The injunction Plaintiffs are seeking would, contrary to their assertion, severely inhibit the University's ability to uphold this compelling interest and prevent dangerous activities on its campus.  Given the multiple credible reports of such conduct, and the repeated nature of the conduct even after University administrators spoke with chapter leaders about complying with the anti-hazing policy, the University had to act.  An injunction would allow those involved in the alleged hazing to continue their unlawful actions unabated, and could have a deleterious impact on the overall University and campus community.

Importantly, consideration of Plaintiffs' First Amendment rights at issue is "shaped by the educational context in which it arises," *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 685 (2010), and thus the Court must be mindful of the compelling interests that are particularly applicable to this context.  First Amendment claims must, therefore, "be analyzed in light of the special characteristics of the school environment," including that universities "enjoy 'significant measure of authority over the type of officially

recognized activities in which their students participate.'" *Id.* at 686-87. "And, where state-operated educational institutions are involved," like in the case at bar, the United States Supreme Court has "recognized 'the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.'" *Healy v. James*, 408 U.S. 169, 180 (1972). "A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981).

More broadly, and "in furtherance of the University's educational mission," the University also has a significant interest in "protecting the educational experience of the students...." *Bowman v. White*, 444 F.3d 967, 980 (8th Cir. 2006) (holding that "[t]his interest is significant because an educated electorate is essential to the vitality of our democracy and a lack of proper education diminishes the value of our free speech rights"). Similarly, the University has a compelling interest in "ensuring public safety" of its campus community, which, "[l]ike education, is a fundamental human need without which the desire to speak one's mind becomes moot." *Id.* Indeed, the Supreme Court has recognized that "a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981).

Critical to the balance of equities analysis is the fact that under common law, the failure of the University to take action like it did in the face of credible allegations of dangerous hazing could expose the University to potential liability. The University owes common law duties in tort to keep their campuses safe from unreasonable risks that were foreseeable, i.e. of which they knew or should have known. *See Rhaney v. Univ. Of Maryland E. Shore*, 388 Md. 585, 601–02 (2005).

In some states, an institution's failure to address reports of hazing could constitute a violation of anti-hazing statutes. *See, e.g. Humphries v. Pennsylvania State Univ.*, 492 F. Supp. 3d 393, 405 (M.D. Pa. 2020) (noting that Pennsylvania's anti-hazing law "allows for findings that an organization or institution violated the law if it "intentionally, knowingly, or recklessly promotes or facilitates" a hazing incident, including by failing to act despite having "knowledge of the alleged incidents"). Thus, it is clear that, contrary to Plaintiffs' assertion that the University has no interests at stake and would suffer no harm if the injunction were granted, issuing an injunction in this case will severely impact the University's ability to carry out its educational mission, comply with the law, and, most importantly, ensure the safety of its students, including, ironically, *plaintiffs' own members*.

In contrast with the University's compelling interests strongly weighing against an injunction, Plaintiffs assert that their interest at stake is the "collegiality and social involvement" which "are at the heart of [their] organizational existences." ECF No. 2-1 at 18. Further, they argue that any limitation on their "unrestricted fraternal experiences" "burdens [their] ability to operate and maintain internal relations and community partnerships." ECF No. 2-1 at 20. In other words, they argue that their competing interest is their ability to function as a social organization on campus. This argument fails to tip the balance in favor of an injunction, however, because the University's order does not prevent Plaintiffs from operating as social organizations on campus. Indeed, as set forth above, the only limitations were to having events where alcohol is consumed and on certain communications with new and potential members. These limitations, which importantly were of limited duration, do not prevent Plaintiffs from having regular meetings, scheduling and hosting events, participating in campus activities, or using University facilities or resources. It would hardly pass muster to suggest that Plaintiffs would cease to operate and exist

simply because of a two-week limitation on alcoholic events and communications about Greek-life with new and potential members.

Courts have rejected such First Amendment challenges where the organizations were able to continue their primary functions.  For instance, in *McKenzie*, the court upheld Maryland's anti-hazing law in the face of a First Amendment challenge because "[n]othing in the anti-hazing statute 'limits the members and prospective members of [the fraternity] or any organization from meeting at any time and place they may choose.'"  *McKenzie*, 131 Md. App. at 147.  Because members could continue to meet when and where they wanted, their First Amendment free association rights were not infringed upon.

Similarly, in *Healy*, the Supreme Court held that a college administration's requirement that a student group who wishes to maintain official recognition must "adhere to reasonable campus law" and agree "to conform with reasonable standards respecting conduct," did not infringe upon the students' First Amendment rights.  *Healy*, 408 U.S. at 192-93.  This holding was based on the fact that a college or other institution, "[j]ust as in the community at large," may impose regulations like the University's order here, "with respect to the time, the place, and the manner in which student groups conduct their speech-related activities."  *Id*. at 192.  However, unlike the case at bar, the Court further concluded that if an organization was prevented from holding meetings and using campus facilities and resources to perform ordinary functions, that would be an "impediment to free association."  *Id*. at 181.

To the extent Plaintiffs argue that their competing interest is in not having their First Amendment rights infringed upon, this argument fails to tip in their favor because, as demonstrated above, they are not likely to succeed on such a claim.  "When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the

merits often will be the determinative factor." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014). This is because the "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). However, because Plaintiffs have not lost their First Amendment freedoms, the balance tips strongly against granting an injunction.

Accordingly, Plaintiffs have failed to demonstrate that their interest in "collegiality and social involvement," which was not infringed upon, outweighs the University's strong and compelling interests in maintaining public safety and preventing hazing. Therefore, Plaintiffs' request for an injunction should be denied.

## IV. PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION.

In addition, Plaintiffs cannot establish that they will suffer irreparable harm if the injunction is denied. "The failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction." *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). Plaintiffs argue that they will suffer irreparable harm without an injunction because for every day the University's order remains "in effect, current University of Maryland students are being deprived of the opportunity to be part of an unrestricted fraternal experience as members of social fraternities and sororities." ECF No. 2-1 at 20. This argument falters first because neither plaintiffs, nor students at the University generally, have a right to an "unrestricted fraternal experience." To the contrary, fraternities, like other student organizations, are required to comport with various policies and procedures, including the University's anti-hazing policy. *See Healy*, 408 U.S. at 193 (holding that a requirement for an organization "to adhere to reasonable campus law" does not infringe upon the First Amendment "freedom to speak out, to assemble, or

to petition for changes in school rules," but rather "merely constitutes an agreement to conform with reasonable standards respecting conduct").

This argument fails equally because Plaintiffs cannot show they would be irreparably harmed without an injunction. Plaintiffs must show that the harm they will face cannot be compensated by damages or other corrective relief. *Doe v. Wake Forest Univ.*, 2023 WL 2239475, at *8. Indeed, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). Plaintiffs have failed to show how the two-week restriction on events with alcohol and communications with new and potential members about Greek-life has caused them any harm, other than a temporary delay, let alone "irreparable harm" that cannot be compensated by damages or other corrective relief. Indeed, now that the University's measures are lifted, any alcoholic events, recruitment, or other "social involvement" that were temporarily delayed as a result of the University's interim measures can immediately resume, without any resulting harm. The only potential exception to this statement is for Plaintiff KAO, which remains subject to a limited cease and desist order, but pursuant to the very notice and Code of Student Conduct process which Plaintiffs themselves argued was appropriate and should be followed.

Accordingly, Plaintiffs have not demonstrated that they will suffer "irreparable harm" if the injunction is denied.

## V.    GRANTING AN INJUNCTION IS AGAINST THE PUBLIC INTEREST.

In addition to Plaintiffs' failure to demonstrate all of the other elements warranting issuance of an injunction, they have also failed to demonstrate that the injunction is in the public interest. "In exercising their sound discretion, courts of equity should pay particular regard for the public

consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. There is a strong public interest against an injunction in this case. Specifically, because the University is a public institution, the University's compelling interests set forth above are also compelling interests for the public at large. This finds support in Maryland's codification of their interest in preventing hazing on university campuses into statutory law. Equally important to the public is the "State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." *Heffron*, 452 U.S. at 650. Although the public has an interest in ensuring that students' First Amendment rights are protected, as demonstrated above there has been no such deprivation of plaintiffs' First Amendment rights. As such, the public interest weighs against granting an injunction.

## CONCLUSION

The motion for a preliminary injunction should be denied.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Lillian L. Reynolds

_____
LILLIAN L. REYNOLDS
Federal Bar No. 30225
KATHRYN J. BRADLEY
Federal Bar No 21242
Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place, 17th Floor
Baltimore, Maryland 21202
lreynolds@oag.state.md.us
(410) 576-6481
(410) 576-6437 (facsimile)

March 15, 2024                                    Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I certify that, on this 15th day of March, 2024 the foregoing memorandum in opposition to plaintiffs' motion for a temporary restraining order and preliminary injunction was served by CM/ECF on all registered CMF users on the following:

Ilana L. Linder
Micah E. Kamrass
Sean P. Callan
Manley Burke LPA
225 W. Court Street
Cincinnati, OH 45202

Alfred Dumetz Carry
McGlinchey Stafford PLLC
1275 Pennsylvania Avenue NW, Suite 420
Washington, DC 20004

/s/ Lillian Reynolds

_____
Lillian Reynolds