# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **ALPHA PSI CHAPTER OF THETA CHI FRATERNITY**, *et al.*, | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | *     Civ. No. DLB-24-00753 |
| | * |
| **JAMES BOND**, *et al.*, | * |
| | * |
| Defendants. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | |
|---|---|
| **GAMMA MU CHAPTER OF KAPPA ALPHA THETA FRATERNITY**, *et al.*, | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | *     Civ. No. DLB-24-00992 |
| | * |
| **JAMES BOND**, *et al.*, | * |
| | * |
| Defendants. | * |

## MEMORANDUM OPINION

In February and March 2024, the University of Maryland (the "University") received complaints that certain fraternities were engaged in dangerous hazing activities with new members. In response, the University issued an order pausing new member activities and prohibiting Greek-letter organizations from contacting "any new member or prospective member." ECF 23-2, at 1. Five days later, the University issued an amended order that allowed members of Greek-letter organizations to contact non-members if the discussions were unrelated to fraternity and sorority activities.

In two consolidated cases, several fraternities, one sorority, and their members sued the University and University employees, alleging that the orders violated their free speech, free association, and due process rights.[1] They also filed a motion for a temporary restraining order. While that motion was pending, the University rescinded the amended order and cleared Greek-letter organizations to "return to normal activities." ECF 12-10, at 3. The plaintiffs then withdrew their motion. The University has moved to dismiss the complaints as moot. The Court agrees that the matter is moot. The Court grants the motions and dismisses the complaints for lack of subject matter jurisdiction.

## I. Relevant Background

The University of Maryland is a public institution in College Park, Maryland. ECF 23, ¶ 17. The University recognizes eligible fraternities and sororities as student organizations. ECF 12-1, ¶ 2. These fraternities and sororities are governed by four councils: the Interfraternity Council ("IFC"), the Multicultural Greek Council ("MGC"), the National Pan-Hellenic Council ("NPHC"), and the Panhellenic Association ("PHA"). *Id.* The majority of students who participate in Greek life belong to organizations that are members of either IFC or PHA. *Id.* These fraternities and sororities recruit new members "for a period of six to eight weeks beginning in or around February of each year." *Id.*

The University Code of Student Conduct ("Code" or "Code of Conduct") prohibits the unauthorized use or possession of any controlled substance. ECF 12-2, at 6–7. It also strictly forbids hazing. *See* ECF 12-3.

---

[1] The fraternities and their members filed two separate cases that later were consolidated. ECF 44. Citations to the docket refer to the docket in the lead case, DLB-24-753, unless otherwise noted.

On or around February 22, 2024, the University's Office of Student Conduct ("OSC") received two referrals that an unnamed fraternity was in violation of the Code of Conduct. ECF 12-1, ¶ 5. First, a fraternity's resident director told OSC that he "found multiple prohibited substances and drug paraphernalia" in that fraternity's house. *Id.* OSC also received an anonymous referral from a parent of a new member of that fraternity. *Id.*; ECF 15-1. The parent informed OSC that the fraternity was hazing their son and his friends. ECF 15-1. According to the referral, the writer's son went to urgent care for possible hypothermia and exhaustion after the fraternity forced him to stay outside for several hours one evening. *Id.* OSC interviewed members of that fraternity in response to the two referrals. ECF 12-1, ¶ 6. Those members "provided inconsistent and apparently false statements to OSC investigators." *Id.*

On the evening of February 27, OSC received an anonymous email from a new fraternity member. *Id.* ¶ 7. That member reported significant hazing within his fraternity and "eight fraternities" that the member did not identify. ECF 15-2, at 2. Specifically, the member alleged that he and other new members had been "beat with a paddle"; "spit on by brothers"; "burned with a torch"; forced "to lie on nails"; and "forced to consume things that are not food," including "an alive fish, chewing tobacco, [and] urine." *Id.* He also shared that fraternity members had repeatedly blown cigarette smoke in new members' faces and even put cigarettes out on new members' skin. *Id.* And he shared that fraternity members forced the new members "to attend a 'Line Up' at which they abuse you for hours on end . . . where they force you to wall sit, do push ups, plank, intentionally harm oneself, be naked/in underwear for the purpose of public humiliation, and be physically assaulted." *Id.* "At one of these [Line Up] events," the member reported, "one individual passed out as they refused to provide us with water and forced us to drink straight vodka and they did nothing to help him, in fact they hit him in the face with a plastic bat and poured beer on him

until he woke up." *Id.* The anonymous member declined to specify which fraternities were participating in hazing but stated that "the list of ones not partaking is shorter." *Id.* The member expected that hazing would only increase in the following weeks. *Id.* at 3–4 ("'Hell Week,' the last week of pledging is coming up and if the regular weeks leading up to it are this bad, I don't even want to know how bad hell week is going to be."). He also feared that if the administration did not intervene, at least one new member would die as a result of the hazing. *Id.* at 4. In that member's eyes, the onslaught of hazing was "a public health crisis within the UMD community." *Id.* at 3.

Two days later, on February 29, the University held a meeting with the fraternity and sorority chapter presidents and other members to discuss the hazing allegations in the February 27 email. ECF 12-6, ¶ 2. Approximately one hundred students attended. *Id.* During the meeting, Assistant Dean of Students Kevin Pitt advised chapter leaders "that the University would take additional actions in response to further allegations of prohibited conduct, including pausing new member activities across one or all of the councils." *Id.* ¶ 4. He also encouraged the chapter leaders to follow up with him to provide additional information about the allegations. *Id.* ¶ 5. None did. *Id.* ¶¶ 5–6.

Several hours after that meeting, in the early morning hours of March 1, emergency responders transported two new members of PHA sororities off campus for medical attention for excessive alcohol consumption. ECF 12-1, ¶ 9. OSC learned of these incidents later that day. *Id.* OSC reviewed data from the University's health and counseling centers and observed a surge in visits by IFC and PHA members in February. ECF 12-8, at 2.

Also on March 1, OSC received a call from a mother of a new fraternity member. ECF 12-1, ¶ 10. The mother shared that members of her son's fraternity were "verbally abusing" the new members, locking them in the basement for 15 hours at a time, and breaking glass bottles in

front of the members and forcing them to clean it up. ECF 15-3, at 2. Her son feared that the hazing would get worse. *Id.*

Based on these events, OSC "determined that immediate action was warranted to prevent harm to the University's students, particularly since it was anticipated that there would be many recruiting activities and social events by the chapters in the coming weekend." ECF 12-1, ¶ 12. The Code of Conduct gives OSC the authority to issue cease and desist orders to "Student Groups or Student Organizations whose continued operation poses a threat to the health and safety of the University community." ECF 12-2, at 11. OSC may issue cease and desist orders effective immediately, without notice, if the student group's operation poses a "substantial threat to the health and safety of their members or others in the community," such as if there is a "hazing allegation." *Id.* The Code also allows OSC to issue no-contact orders. *Id.* at 5. Under the University's anti-hazing policy, OSC may issue "a 'no contact' directive serving as notice to the organization or its members that they must not have verbal, electronic, written, or third-party communication with one another or with the student(s) seeking membership" as an interim measure pending the investigation of hazing allegations. ECF 12-3, at 6.

OSC invoked its authority under the Code. On March 1, OSC sent a letter ("the Order") to all IFC and PHA member organizations stating that, "effective immediately, all IFC and PHA new member program activities are suspended indefinitely, pending the results of a thorough investigation." ECF 23-2, at 1. It also placed all IFC and PHA member organizations on "social moratorium," which prohibited the chapters "from hosting any events, on or off-campus, where alcohol is present." *Id.* The letter notified the organizations "that the current members of the organization are to have absolutely NO CONTACT with any new member or prospective new member." *Id.* The letter warned that OSC would investigate the hazing allegations. *Id.*

5

OSC sent a second letter to the member organizations on March 6. ECF 23-3, at 1. The letter "clarif[ied]" that the "no contact order is limited to communications regarding Greek-letter organization-related activities." *Id.* Instead, "[i]f new members and current members share an affiliation with, or membership in, another student organization or activity, they are permitted to communicate with each other about topics that are not related to their shared affiliation with the Greek-letter organization," including "UMD course-related work," "[e]mployment operations," and "[o]ther UMD organizations and activities." *Id.* It explained that "[t]he purpose behind this restriction is to implement a pause on new member activities while the University completes its investigation into widespread allegations of health and safety infractions in organizations' new member intake processes, and to help effectuate a prompt and effective investigation into such allegations." *Id.* at 2.

In the meantime, the University engaged an outside consulting firm to interview students about the hazing allegations. ECF 12-1, ¶ 13. OSC sent a third letter to the member organizations on March 8, informing them that the consulting firm would invite "a number of current and new members from each IFC and PHA chapter" to interview as part of its investigation. ECF 12-9, at 2. The interviews were scheduled from March 11 until March 15. *Id.*

On March 13, four IFC organizations (Alpha Psi Chapter of Theta Chi Fraternity, Beta Kappa Chapter of Kappa Alpha Order, Epsilon Delta Chapter of Alpha Sigma Phi Fraternity, and Epsilon Gamma Chapter of Alpha Tau Omega Fraternity) and three anonymous members of the organizations sued the University and several administrators.[2] ECF 1. The complaint alleged that the Order violated Alpha Psi's rights to free speech, free association, and due process. *Id.* ¶¶ 51–

---

[2] The Court refers to the plaintiffs in the consolidated case collectively as "Alpha Psi" and the defendants collectively as "the University."

77. Alpha Psi sought "temporary, preliminary, and permanent injunctive relief" prohibiting the University from enforcing the Order, a declaration that the Order is unconstitutional, and reasonable costs and expenses. *Id.* at 15–16. Alpha Psi also moved for a temporary restraining order and preliminary injunction. ECF 2. The next day, on March 14, the Court ordered the University to respond by 7:00 p.m. on March 15 and scheduled a hearing on Alpha Psi's motion for March 18. ECF 11. .

The University lifted the Order at 4:00 p.m. on March 15, ECF 12-10, at 3, after the consulting firm's "preliminary factfinding investigation . . . concluded," ECF 12-1, ¶ 14. The consulting firm conducted over 150 interviews with leaders and members of IFC and PHA chapters. ECF 12-10, at 2. In its notice lifting the Order, the University indicated that 32 IFC and PHA chapters were cleared to return to normal activities. *Id.* at 3. Five chapters remained under investigation and would "continue to be subject to limited restrictions on their activities while the investigation continues." *Id.* The University shared that it would make certain changes in response to the investigation. *Id.* Specifically, it would create a working group on fraternity and sorority life, "conduct a comprehensive review of all existing IFC and PHA training programs on recruitment and alcohol-related activities," create "expanded reporting mechanisms" for students and others to report hazing, review the hazing- and alcohol-related portions of the Code of Conduct, work and facilitate communication with chapter advisors and national organization leadership, and develop additional educational opportunities for all chapter members regarding alcohol and drug use. *Id.* The University reaffirmed its "commit[ment] to fraternity and sorority life." *Id.* That evening, Alpha Psi withdrew its motion for preliminary injunctive relief "as moot." ECF 16, at 1.

On April 4, one PHA chapter, the Gamma Mu Chapter of Kappa Alpha Theta Fraternity, and six anonymous sorority members filed an almost identical lawsuit against the University and its administrators. *See* ECF 1 in *Gamma Mu Chapter of Alpha Theta Fraternity v. Bond*, No. DLB-24-992. On April 8, Alpha Psi filed an amended, verified complaint. ECF 23. That complaint no longer named one IFC chapter, the Beta Kappa Chapter of the Kappa Alpha Order, and one anonymous member, John Doe 3, as plaintiffs. *See id.* ¶¶ 5–12. The amended complaint added additional allegations that the defendants "have denied (and continue to deny) that their actions in imposing (or keeping in place) the [Order] were unconstitutional," "have not completely and irrevocably eradicated their unconstitutional conduct or the effects of their past violations," and "do not believe they acted contrary to law in imposing (or keeping in place) the [Order]." *Id.* ¶¶ 57–59. Instead, the University Vice President for Student Affairs, Patricia Perillo, "indicated she believes that Defendants 'set a model for what [other] universities can and should do' in similar situations." *Id.* ¶ 60. Alpha Psi alleged that the University's "policies and practices . . . have a chilling effect on future speech" and frustrate its organizational mission. *Id.* ¶¶ 63–64. It also alleged that it "face[s] real and immediate threats that Defendants will again proceed with investigating and/or imposing disciplinary measures devoid of procedural due process protections, or depriving Plaintiffs of their First Amendment rights, or both." *Id.* ¶ 66.

The University moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim. ECF 40. Simultaneously, it moved to dismiss the complaint in the related suit brought by Gamma Mu and the anonymous sorority members. *See* ECF 21 in DLB-24-992. While those motions were pending, the University filed an unopposed motion to consolidate the Alpha Psi and Gamma Mu cases. ECF 41. The Court granted that motion and consolidated the cases. ECF 44. The

University's motions to dismiss the Alpha Psi and Gamma Mu cases are fully briefed. ECF 40-1, 45, 52 (Alpha Psi); ECF 21-1, 46, 43 in DLB-24-992 (Gamma Mu). A hearing is not necessary. *See* Loc. R. 105.6 (D. Md. 2023).

## II.     Standard of Review

"A motion to dismiss based on lack of subject matter jurisdiction pursuant to Rule 12(b)(1) raises the question of whether the court has the competence or authority to hear the case." *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). "Federal courts are courts of limited jurisdiction[,]" possessing "only that power authorized by Constitution and statute." *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010) (quoting *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)). The plaintiff, as the party asserting jurisdiction, bears the burden of establishing it. *Id.*

When the defendant asserts that facts outside of the complaint deprive the court of jurisdiction, the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004). A Rule 12(b)(1) motion "must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

## III.    Discussion

Article III of the Constitution limits the judicial power of the federal courts to actual "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. To sustain a federal court's jurisdiction, an "'actual controversy' must exist not only 'at the time the complaint is filed,' but through 'all stages' of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (quoting *Alvarez v. Smith*, 558 U.S. 87, 92 (2009)). "[W]hen the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," the case becomes moot, and "therefore no longer

a 'Case' or 'Controversy' for purposes of Article III." *Id.* at 91 (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)).

The University moves to dismiss the complaints as moot. Alpha Psi argues that the voluntary cessation exception to the mootness doctrine applies. It does not. This case is moot.

Under the voluntary cessation rule, "a defendant may [not] 'automatically moot a case' by the simple expedient of suspending its challenged conduct after it is sued." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Already*, 568 U.S. at 91). Otherwise, a defendant could return to the challenged conduct as soon as the plaintiff's complaint is dismissed. *See id.*; *see also Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."). While the plaintiff generally bears the burden of establishing subject matter jurisdiction, the "heavy burden" of proving that the voluntary cessation exception does not apply "lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). The standard for determining whether a pending case "has been mooted by the defendant's voluntary conduct is stringent: 'A case might become moot if subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)). Even though "it is not easy to make a sufficient showing that the voluntary cessation exception does not apply, it is not impossible." *Lighthouse Fellowship Church v. Northam*, 20 F.4th 157, 162 (4th Cir. 2021). The University has met its burden to show the voluntary cessation exception does not apply.

The Fourth Circuit's decision in *Eden, LLC v. Justice*, 36 F.4th 166 (4th Cir. 2022), controls. There, the Governor of West Virginia declared a state of emergency and issued a series of executive orders in response to the COVID-19 pandemic. *Id.* at 168. Some of those orders directed the closure of all West Virginia schools, gyms and fitness centers, barber shops, nail salons, and hair salons. *Id.* Another order directed citizen to stay home unless they were performing an "essential activity," directed all "'[n]on-essential businesses' to temporarily cease operations," and prohibited gatherings of more than ten people. *Id.* Over the next few months, the Governor issued other executive orders modifying these measures as the number of COVID-19 cases rose or fell within the state. *Id.*

Several businesses and individuals affected by the orders sued the Governor. *Id.* The district court dismissed their complaint for failure to state a claim. *Id.* at 169. The plaintiffs appealed. *Id.* But while their appeal was pending, the Governor terminated each restriction the plaintiffs challenged. *Id.* And though the Governor did not terminate the state of emergency, he did not promulgate any subsequent COVID-19 restrictions. *Id.*

The Fourth Circuit held that the case was moot. *Id.* at 170. It found that the plaintiffs "ha[d] already received the 'precise relief' they sought in this case: termination of the challenged executive orders." *Id.* (quoting *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 590 U.S. 336, 338 (2020) (per curiam)). There was no relief a court could give the plaintiffs. *Id.* Even if the court considered the merits of the plaintiffs' challenge, no decision it issued "would have any 'practical effect' in the real world." *Id.* (quoting *Norfolk S. Ry. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010)).

The court found that the voluntary cessation exception did not apply. *Id.* at 170–71. First, the Governor terminated the orders more than a year before the court issued its opinion and did

11

not impose any new restrictions in the intervening months. *Id.* at 171. Second, the court looked to "the advent of 'vaccines and other measures to combat the virus'" and found that those measures made "the likelihood of a recurrence still more remote." *Id.* (quoting *Lighthouse Fellowship Church*, 20 F.4th at 164). The court also considered the surges of COVID-19 cases caused by deadly variants in the intervening months, and it noted that, notwithstanding the surges, the Governor declined to reinstate the restrictions. *Id.* Thus, the court concluded, "there is 'no reasonable expectation' that COVID-19 restrictions like the ones to which the plaintiffs object will be reimposed." *Id.* (quoting *Lighthouse Fellowship Church*, 20 F.4th at 164). That was true even though the Governor "ha[d] not formally ended West Virginia's state of emergency" and "retain[ed] the power to close schools and businesses at his discretion." *Id.* As the court explained, "a governor's mere ability to reimpose challenged restrictions is not enough to show a reasonable chance of recurrence." *Id.* at 172. Instead, a court must undertake "a 'factual inquiry' into the actual 'likelihood of recurrence of the offending behavior.'" *Id.* (quoting *Lighthouse Fellowship Church*, 20 F.4th at 164 n.6). The court found "that factual inquiry yield[ed] a clear answer: There [was] no reasonable chance of recurrence." *Id.* The court vacated the district court's judgment and remanded with instructions to dismiss the case as moot. *Id.*

Here, as in *Eden*, the plaintiffs received the relief they sought: termination of the challenged Order. Whether that development moots their case depends on the outcome of the "factual inquiry" into the likelihood that the University will issue the Order again. That factual inquiry yields the same result as in *Eden*: There is no reasonable chance of recurrence. The University issued the Order in response to a public health emergency that has long concluded. The University received multiple allegations of life-threatening hazing by several IFC organizations. It did not know which organizations were responsible. When it interviewed members of one fraternity, the members

"provided inconsistent and apparently false statements to OSC investigators." ECF 12-1, ¶ 6. When it held a meeting with the fraternity and sorority chapter presidents and other members to discuss hazing allegations and encouraged the chapter leaders to follow up with him to provide additional information about the allegations, none of the chapter leaders provided any additional information. ECF 12-6, ¶¶ 2, 5–6. In response to these concerns of parents and new members that University students' lives could be in jeopardy, and unable to obtain additional information from any of the fraternities or sororities, the University issued an Order that addressed the exigencies of the situation. It imposed a social moratorium, paused new member activities, and issued a no-contact order while it investigated which organizations were participating in hazing. It is unlikely that the storm of events that prompted the Order—the four referrals, the rise in health and counseling center visits across ten IFC and PHA organizations, the alcohol-related hospitalizations, and the refusal of the fraternities and sororities to respond to the University's request for information—will reoccur.

And the University imposed the Order for a limited, finite purpose that has since concluded: "to implement a pause on new member activities while the University completes its investigation into widespread allegations of health and safety infractions in organizations' new member intake processes, and to help effectuate a prompt and effective investigation into such allegations." ECF 23-3, at 2. That investigation was limited in scope and time. According to the University's March 8 email, sent before Alpha Psi filed its complaint, the outside consulting firm would conduct interviews from March 11 until March 15. In the University's March 6 email clarifying the scope of the Order, the University stressed that it was "critical that the University preserve the credibility of student responses during the investigatory process." *Id.* at 2. Though the Order did not have an expiration date, the University clearly contemplated that it would be effective only during the

13

factfinding phase of the investigation because its purpose was to protect the integrity of the factfinding mission. When the factfinding phase of the investigation concluded, the University rescinded the Order. The University's subsequent actions show its commitment to Greek life on campus. Nothing suggests the University will "resum[e] . . . the challenged conduct as soon as the case is dismissed." *See Knox*, 567 U.S. at 307; *see also Friends of the Earth*, 528 U.S. at 189 (suggesting that the voluntary cessation exception exists to prevent courts from leaving "[t]he defendant . . . free to return to his old ways" (alterations in original) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982))). And there is no reasonable chance that the events prompting the Order will recur or that the University will issue the same or a similar order in the future.

Alpha Psi argues that the voluntary cessation exception applies because the University retains the power to reinstate the Order. In support of this argument, Alpha Psi cites two Eighth Amendment cases, *Porter v. Clarke*, 852 F.3d 358 (4th Cir. 2017), and *Wall v. Wade*, 741 F.3d 492 (4th Cir. 2014). In *Porter* and *Wall*, the Fourth Circuit held that a challenge to prisoners' conditions of confinement were not moot because the prison "retain[ed] the authority and capacity to repeat an alleged harm." *Wall*, 741 F.3d at 497; *Porter*, 852 F.3d at 364–65 (quoting *Wall*, 741 F.3d at 497). But the same was true in *Eden*. The state of emergency continued, and the Governor could have lawfully reimposed the same restrictions. Even so, the possibility of recurrence was remote. The Fourth Circuit concluded that "a governor's mere ability to reimpose challenged restrictions is not enough to show a reasonable chance of recurrence." *Eden*, 36 F.4th at 172. So too here. The Code of Conduct still allows the University to respond to hazing allegations with no-contact orders and cease and desist orders, and hazing at the University may recur. But the unique

14

circumstances that gave rise to the Order have long passed. It is highly unlikely that the University will reinstate the same order again.

Alpha Psi insists the voluntary cessation exception applies because the University has refused to disavow the Order. As Alpha Psi points out, a University administrator, Vice President for Student Affairs Patricia Perillo, "has indicated she believes that [the University] 'set a model for what [other] universities can and should do' in similar situations." ECF 23, ¶ 60. Disavowal of the rescinded Order is not necessary to establish there is no reasonable chance that the Order will recur.

The University issued the Order in response to an unprecedented confluence of events. When the Order was issued, the University had received an anonymous report from one new member who reported that, based on his experience and the experiences of his friends across eight unidentified fraternities, hazing was widespread and would continue for several weeks. Others made similar reports, health and counseling visits surged, there were two hospitalizations, and the chapter leaders refused to provide any information that would help the University address the emergency. That crisis is over, and Greek life continues at the University. Fraternities and sororities continue to invite new members to join each year. But the chances that the circumstances that prompted the University to issue the Order in March 2024 will recur are extremely unlikely. To find this case is not moot, the Court would have to presume that the IFC and PHA organizations will repeat the same misconduct and will refuse to respond to the University's request for information about the allegations. The Court will not make that presumption. *See Incumaa v. Ozmint*, 507 F.3d 281, 289 (4th Cir. 2007) (refusing to presume that prisoner would be moved to restrictive housing unit again because prisoner's future reassignment to unit depended on his behavior); *see generally Honig v. Doe*, 484 U.S. 305, 320 (1988) ("[W]e generally have been

15

unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury."). While it is possible that the University will issue another cease and desist or no-contact order one day, it is not likely that the University will issue another order similar to the order challenged here.

The University's burden to show mootness is "formidable." *See Fikre*, 601 U.S. at 778. The University has met it here.[3]

### IV. Conclusion

"Federal courts have no power to hear moot cases." *Brooks v. Vassar*, 462 F.3d 341, 348 (4th Cir. 2006). Because this case is moot, this Court must dismiss it for lack of subject matter jurisdiction. *See Adams Outdoor Advert. Ltd. P'ship v. Beaufort County*, 105 F.4th 554, 564 (4th Cir. 2024). The University's motions to dismiss under Federal Rule of Civil Procedure 12(b)(1) are granted. All claims are dismissed without prejudice. A separate order follows.

Date: March 31, 2025

Deborah L. Boardman
United States District Judge

---

[3] In passing, Alpha Psi suggests that the capable of repetition, yet evading review exception may apply. *See* ECF 45, at 4 (acknowledging "a case that would otherwise be moot is not moot if the underlying dispute is capable of repetition, yet evading review") (citing *Kobe v. Haley*, 666 F. App'x 281, 296 (4th Cir. 2016)). Unlike the voluntary cessation exception, the plaintiff bears the burden of proving the capable of repetition, yet evading review exception applies. *See Incumaa v. Ozmint*, 507 F.3d 281, 289 (4th Cir. 2007). Courts apply a two-prong test to determine whether this exception applies. First, the plaintiff must show that "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam). Next, the plaintiff must show "a reasonable expectation that [it] would be subjected to the same action again." *Id.* Alpha Psi does not argue how it meets the capable of repetition, yet evading review standard. It has not met its burden to show that this exception saves its claims from mootness.

16